283 S.C. 155 (1984)
321 S.E.2d 602
John Wendell TODD, Respondent,
v.
SOUTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, Southern Farm Bureau Casualty Insurance Company, Southern Farm Bureau Life Insurance Company, and Equifax Services, Inc., Appellants.
0237
Court of Appeals of South Carolina.
Heard March 28, 1984.
Decided August 21, 1984.
*156 *157 *158 Harold W. Jacobs and James W. Orr, both of Nexsen, Pruet, Jacob & Pollard, Columbia; J. Dwight Hudson, and John B. McCutcheon, Jr., of McCutcheon, McCutcheon & Baxter, Conway, *159 E. Ellison Walker of McKay, Sherrill, Walker & Townsend, Columbia, for appellants.
James P. Stevens, Sr., and James P. Stevens, Jr., both of Stevens, Stevens, Thomas, Hearn & Hearn, Loris, and Terry E. Richardson, Jr. of Blatt & Fales, Barnwell, for respondent.
Debora Faulkner, Richard G. Hepfer, Columbia, David Simpson, Rock Hill, and Deborah Weimer, Columbia, amicus curiae for South Carolina Legal Services Ass'n.
Herbert E. Buhl, III, Columbia, amicus curiae for South Carolina Brown Lung Ass'n.
Stephen J. Henry, Columbia, amicus curiae for The Workers' Rights Project of the Southerns for Economic Justice.
Robert T. Thompson, John P. Mann and E. Scott Smith, Greenville, amicus curiae for South Carolina Chamber of Commerce.
Heard March 28, 1984.
Decided August 21, 1984.
CURETON, Judge:
The broad issue raised on this appeal is whether on the evidence presented, respondent Todd, an employee-at-will of the appellants South Carolina Farm Bureau Mutual Insurance Company (Mutual), Southern Farm Bureau Casualty Insurance Company (Casualty) and Southern Farm Bureau Life Insurance Company (Life), is entitled to damages for termination of his employment on the theories of outrage, intentional interference with a contract, and bad-faith termination of a contract. The trial court, in denying the appellants' motions for summary judgment, nonsuit, directed verdict and judgment notwithstanding the verdict, found the evidence sufficient to support the jury's general verdict for Todd for $20,000 actual damages against the four appellants, $40,000 punitive damages against Mutual, $30,000 punitive damages against Equifax and $10,000 punitive damages against Casualty. We believe this was error and reverse.
The evidence, viewed in the light most favorable to Todd as is required when reviewing the denial of motions challenging the sufficiency of the evidence to sustain a verdict, reveals the following.
*160 Todd was hired by Bill Lee as an insurance agent for the Mutual, Casualty and Life companies in March, 1970, under a separate contract with each. The contracts were terminable without cause upon ten days written notice. Todd was assigned to the Loris office under the supervision of Brice Hardwick.
Though separate companies, Mutual, Casualty and Life shared common sales agents pursuant to corporate policies requiring that an agent represent all three companies. Life offered life insurance contracts. Both Casualty and Mutual offered homeowner and automobile insurance policies.
The authority to hire and fire sales agents for the three companies was centralized in Bill Lee, vice-president of sales for Mutual and state sales manager for Life and Casualty. Employment with one company required employment with the other two; discharge from one required discharge from the remaining companies.
During the first six months of 1978, a suspiciously large number of homes insured by Mutual or Casualty burned to the ground within the Loris territory. Gerald Garnett, claims manager for both Mutual and Casualty, hired Equifax to investigate for arson. Equifax assigned J.K. Parrish and Ed Pope, investigators in its employ, the task of carrying out the investigation.
In early February, 1979, Parrish met with Todd and his supervisor, Hardwick, in Hardwick's office where Parrish informed Todd that they had learned through an informant that Todd was leaking information about the investigation to a torch man. Parrish stated that he wanted to give Todd a voice stress analysis test (PSE), a test allegedly designed to determine deception. The use of the test in South Carolina is illegal since it fails to record certain physiological responses. S.C. Code Ann. Section 40-53-40 (1976). Garnett, the claims manager for Mutual and Casualty, had been advised that Todd would be asked to take the PSE test and had tacitly approved it. Todd agreed to take the test which was administered by Parrish the next day in the presence of Hardwick, whose presence Todd requested. Todd was asked twelve questions which he answered into a regular tape recorder. The tape was then sent to Atlanta, Georgia, for analysis.
The PSE test results were returned to Garnett who informed Bill Lee that Todd had "stressed" on several questions, *161 indicating deception. Based on this information, of which Todd was unware, Lee met with Todd and Hardwick on February 8, 1979, and told Todd "we want you to take a polygraph exam. [W]e are going to clear up things ...." Todd agreed to the polygraph test which was scheduled for February 14, 1979.
On February 13, 1979, Todd called Bill Lee in Columbia and requested that Lee postpone the polygraph test until Todd's attorney, who was in the middle of a trial, could be present. Lee refused, informing Todd that his resignation would be requested if he failed to take the test the next day. When Todd stated he would not take the test the next day or resign, Lee fired him immediately. Two days later, Todd received a letter from Lee terminating his contracts with Mutual, Life and Casualty effective ten days from the date of the letter.
The existence of an informant who fingered Todd as the source of the leak was seriously called into question by evidence that Parrish first identified the informant, retracted the identification, then named a captain of the Conway Police Department who testified at trial that he never told Parrish that Todd was leaking information. Todd consistently maintained his innocence and subsequently took a polygraph test in preparation for trial.[1]
As a result of the accusations, administration of the illegal PSE test and termination of his contracts, Todd testified that he suffered "a lot of stress and strain," embarrassment and shame. He did not seek medical treatment although for several years previously, he had been treated for stress.
Todd initiated this suit against Mutual, Casualty, Life and Equifax, each, for (1) intentional interference with a contract, (2) outrageous conduct causing severe emotional distress, (3) bad-faith termination of a contract, and (4) invasion of privacy. Various pre-trial motions were made, denied and appealed to the Supreme Court. Todd v. South Carolina Farm Bureau Mutual Insurance Co., 276 S.C. 284, 278 S.E. (2d) 607 (1981).
During the trial, the court directed verdicts in favor of Life on the action for intentional interference, Equixfax on bad-faith termination, and all four appellants on invasion of *162 privacy. The jury returned a general verdict for Todd against the four appellants for $20,000 actual damages. Mutual, Equifax and Casualty were also found liable for punitive damages of $40,000, $30,000 and $10,000, respectively.
The appellants contend the trial court erred in, among other things, denying their motions for summary judgment, nonsuit, directed verdict and judgment n.o.v., as to each of the remaining actions. Our review of the record and relevant legal principles convinces us of the merit of the appellants' contention.
First, we feel it appropriate to dispose of the parties' contentions regarding what is commonly called the "two issue" rule. Relying on Anderson v. West, 270 S.C. 184, 241 S.E. (2d) 551 (1978), Todd asserts that where the jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal. Based on this legal principle, Todd argues that if the evidence as to either of the three causes of action supports liability, this Court may not reverse the judgment.
The appellants concede that this State recognizes the "two-issue" rule. They contend, however, that because they moved for directed verdicts as to each action, there must now be sufficient evidence as to each action to sustain the verdict. In support of this argument, appellants cite Dillon v. Barnard, 328 Mass. 53, 101 N.E. (2d) 345 (1951) and 89 C.J.S. Trial § 505 (1955).
While we recognize a minority view to the contrary, we believe the better rule is that the general verdict will be affirmed even against motions for directed verdicts as to each action where evidence supports the verdict as to at least one action. Dunlap v. Jimmy GMC of Tucson, Inc., 136 Ariz. 338, 666 P. (2d) 83 (Ariz. App. 1983); see, Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 404 A. (2d) 889 (1978); Colonial Stores, Inc. v. Scarbrough, 355 So. (2d) 1181 (Fla. 1977); Siegal v. Health Care Service Corp, 81 Ill. App. (3d) 784, 36 Ill. Dec. 899, 401 N.E. (2d) 1037 (1980); Roth v. Meeker, 72 Ill. App. (3d) 66, 27 Ill. Dec. 840, 389 N.E. (2d) 1248 (1979); Leigh Furniture and Carpet Co. v. Isom, 657 P. (2d) 293 (Utah 1982).
In extending the holding of Anderson v. West, supra, we note, as other jurisdictions have, that the remedy to any perceived injustice occasioned by this rule is always in the *163 hands of defense counsel. Counsel may request special verdicts after a motion for a directed verdict is denied. Having agreed to submit the case to the jury on a general verdict, the appellants cannot now be heard to challenge the validity of the general verdict if evidence sustains the award of damages on at least one action. We must now determine if the evidence sustains the verdict.

I.
Todd contends that the jury could reasonably infer from the evidence in support of his first cause of action for intentional interference with contractual relations that each of the Farm Bureau companies, through the actions of its employees and in concert with Equifax, interfered with his contract with the other Farm Bureau companies by: (1) falsely and maliciously accusing him of leaking information; (2) administering to him an illegal PSE test; and (3) requiring that he take a polygraph test without counsel, based on the results of the illegal PSE test.
The Farm Bureau companies argue that Todd's evidence fails to support an action for intentional interference in three particulars: (1) the Farm Bureau companies were parties to Todd's contracts and cannot be held to have interfered with them; (2) contracts terminable at will, as Todd's were, will not support an action for intentional interference; and (3) the evidence fails to show that the Farm Bureau companies committed any of the acts Todd alleged to constitute unlawful interference.
It is established in this State that to prevail on an action for intentional interference with contractual relations, the plaintiff must prove (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages. DeBerry v. McCain, 275 S.C. 569, 574, 274 S.E. (2d) 293, 296 (1981); Threlkeld v. Christoph, 280 S.C. 225, 312 S.E. (2d) 14 (S.C. App. 1984).
Having considered the appellants' arguments to the contrary, nevertheless we hold that a contract terminable at will is a contract upon which an action for intentional interference may be brought. We conclude, along with a majority of jurisdictions, that where a third party induces an employer to discharge an employee who is working *164 under a contract terminable at will, but which employment would have continued indefinitely except for such interference, a cause of action arises in favor of the employee against the third person. Smith v. Ford Motor Co., 289 N.C. 71, 221 S.E. (2d) 282 (1976); King v. Schaeffer, 123 Ga. App. 531, 181 S.E. (2d) 700 (1971).
It is settled beyond dispute that an action for intentional interference with contractual relations will not lie against one who is a party to the contract. Ross v. Life Insurance Company of Virginia, 273 S.C. 764, 259 S.E. (2d) 814 (1979); Threlkeld v. Christoph, supra; Cummings v. Walsh Construction Co., 561 F. Supp. 872 (S.D. Ga. 1983); George A. Davis, Inc. v. Camp Trails Co., 447 F. Supp. 1304 (E.D. Pa. 1978); RESTATEMENT (SECOND) OF TORTS SECTION 766 (1979). It is equally clear that a corporate employer is a party to the contract of its employee, and an officer or agent of the corporation acting for or on behalf of the corporation is not a third party either. Ross v. Life Insurance Company of Virginia, supra; Muller v. Stromberg Carlson Corp., 427 So. (2d) 266 (Fla. App. 1983).
The very nature of the tort of intentional interference with a contractual relationship requires that the third party's interference in fact procure the breach complained for. The alleged act of interference must influence, induce or coerce one of the parties to the contract to abandon the relationship or breach the contract. West v. Troelstrup, 367 So. (2d) 253 (Fla. App. 1979). The plaintiff must show that but for the interference, the contractual relationship would have continued. Annot., 5 A.L.R. 4th 9, 37 (1981) (citing jurisdictions adhering to the rule).
Our review of the record reveals, among other deficiencies, no evidence of third party interference by the Farm Bureau companies. Apparently realizing the difficulty of showing third party action, Todd alleged and argued two facts: first, the Farm Bureau companies are third parties with respect to each other in the actions undertaken; and second, the companies are liable for the acts of Equifax, their agent, or as participants with Equifax in a conspiracy to bring about a breach.
Todd's first contention begs the question since the issue is third party interference. The record is devoid of admissible evidence that any single Farm Bureau company interfered with Todd's contracts with the other companies *165 by either accusing Todd of leaking information or administering a PSE test to him. Equally unpersuasive is Todd's argument that Bill Lee was guilty of third party interference. Since Lee was the person who terminated each of Todd's employment contracts, he was not acting as a third party. Lee, as manager of sales agents for each of the three companies, had sole authority to discharge Todd from his contracts with each of them. In legal effect, his actions were those of a first party, not those of a stranger to the contracts.
Nor is there evidence to support an inference that the Farm Bureau companies are liable on agency or conspiracy principles. The admissible evidence reveals that Equifax was hired by the companies, or some of them, to conduct an investigation. Equifax's actions were neither directed nor controlled by the companies. Therefore, we hold that Todd's action against the Farm Bureau companies for intentional interference cannot be sustained on the evidence.
Likewise, we find that Equifax's actions in accusing Todd of leaking information and administering the illegal PSE test did not procure the subsequent alleged breaches of contract. The evidence reveals that Todd remained employed with the Farm Bureau companies for some time following each of the acts. It was only when Todd refused to admit to the request that he immediately take the polygraph test that his discharge occurred. The evidence does not show that Equifax had any part in the decision to administer the polygraph test or to fire Todd because he did not take the test.
Of course we grasp the significance of the argument made by Todd that Equifax's actions set in motion a chain of events which ultimately led to his dismissal. The legal requirement, however, is evidence which supports a reasonable inference that Equifax's actions induced or coerced the Farm Bureau companies to discharge Todd. On the evidence in the record, we hold as a matter of law that Todd failed to present evidence that Equifax intentionally procured the breach of his contracts with the Farm Bureau companies.

*166 II.
Todd's second cause of action alleges that the Farm Bureau companies and Equifax engaged in outrageous conduct which caused him severe emotional distress. He contends the evidence gives rise to a reasonable inference that he suffered severe emotional distress as a result of the actions of the Farm Bureau companies and Equifax in (1) fabricating an informant for the purpose of accusing Todd of leaking information, and (2) administering an illegal test for deception which test implicated his credibility and ultimately led to his termination.
The appellants argue that Todd's evidence failed to satisfy two elements of the tort of outrage or intentional infliction of emotional distress as expressed by the Supreme Court in Ford v. Hutson, 276 S.C. 157, 276 S.E. (2d) 776 (1981): (1) outrageous conduct, and (2) the infliction of severe emotional distress.
The tort of intentional infliction of emotional distress was first given express recognition in this State in Ford v. Hutson, supra. In formulating a statement of the nature of the tort, the Supreme Court relied heavily on the Restatement (Second) of Torts Section 46:
[I]n order to recover for the intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct, RESTATEMENT (SECOND) OF TORTS SECTION 46, comment i; (2) the conduct was so `extreme and outrageous' as to exceed `all possible bounds of decency' and must be regarded as `atrocious, and utterly intolerable in a civilized community,' RESTATEMENT (SECOND) OF TORTS SECTION 46, comment d; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was `severe' so that `no reasonable man could be expected to endure it.' RESTATEMENT (SECOND) OF TORTS SECTION 46, comment j.
*167 Id. at 162, 276 S.E. (2d) at 778.
Todd asserts that it is for the jury to determine whether the appellants' acts were so outrageous as to establish liability for the infliction of severe distress. We disagree. It is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons may differ is the question one for the jury. RESTATEMENT (SECOND) OF TORTS SECTION 46, comment h; Annot., 86 A.L.R. (3d) 454, 457 (1978).
The dissent's insistence that an initial judicial determination whether the appellants' conduct may reasonably be considered outrageous usurps the jury's function reveals a basic misunderstanding of the elements of the tort of outrage and the function of a court on a motion for a directed verdict. Our Supreme Court fully stated the trial court's responsibility in reviewing such a motion in Horton v. Greyhound Corporation, 241 S.C. 430, 438, 128 S.E. (2d) 776, 781 (1962):
In passing upon a motion for a directed verdict, it is the duty of the court to view the evidence and all inferences which may reasonably be drawn therefrom in the light most favorable to plaintiff. However, where the only reasonable inference from the evidence is that there has been a failure of proof as to a material element of plaintiff's cause of action, it becomes the duty of the court to resolve the issue against the party having the burden of proof by directing a verdict. Whether more than one reasonable inference can be drawn is, necessarily, for the court to determine. Otherwise, verdicts would be allowed to rest on conjecture and speculation, which is prohibited. (Emphasis added).
In essence, on every motion for a directed verdict, the trial court, and this Court on appeal, must first establish what the elements of the cause are, and second, whether there is any evidence to support each element.
We have already established that one of the elements of the tort of outrage or intentional infliction of emotional distress in outrageous conduct. It is the legal responsibility of the court to determine whether, on the evidence before it, the *168 defendant's conduct may reasonably constitute outrageous conduct.
The dissent misreads the Supreme Court's decision in Hensley v. Heavrin, 277 S.C. 86, 282 S.E. (2d) 854 (1981), as lending support to the view that the trial court has no role in determining whether conduct may be considered outrageous. The case was before the Supreme Court on appeal from the trial court's overruling of defendant's demurrer to the plaintiff's complaint "for medical malpractice." Id. at 87, 282 S.E. (2d) 854. The Court held that the pleading stated a cause of action for outrage. In dictum, the Court noted that "[t]he question of whether the action of appellant [in incorrectly diagnosing venereal disease] was of such an extreme and outrageous nature as to constitute the tort of mental distress is a question of fact to be determined by the jury." Id. at 88, 282 S.E. (2d) 854.
We do not differ with this statement of law. There is a distinct difference, however, between determining whether conduct may reasonably be considered outrageous, a legal question, and whether conduct is in fact outrageous, a question for jury determination.
Likewise, we are not unmindful of the fact that the Supreme Court overruled demurrers alleging the failure to state a cause of action in both Hensley and this case, Todd v. South Carolina Farm Bureau Mutual Insurance Co., supra. In effect, the Court held that if each of the plaintiffs could prove what he or she alleged, each would be entitled to recovery. See Glass v. Glass, 276 S.C. 625, 281 S.E. (2d) 221 (1981). The Court noted in Todd, however, that it "intimate[d] no opinion as to the ultimate viability of [Todd's] claim." 276 S.C. at 289, 281 S.E. (2d) 221. The ultimate viability of any claim is determined by the evidence produced at trial rather than the allegations of the pleadings. Turner v. ABC Jalousie Company of North Carolina, 251 S.C. 92, 160 S.E. (2d) 528 (1968).
Neither the trial court nor this Court is at liberty to substitute its subjective and provincial sensibilities regarding what is reprehensible and socially intolerable conduct for the guidelines which our Supreme Court has established with its adoption of the Restatement formulation of the tort.
*169 The Restatement Second provides at least three guidelines limiting the scope of intentional infliction of emotional distress: (1) the conduct must be "extreme and outrageous," exceeding "all bounds of decency," "atrocious," and "utterly intolerable"; (2) abusive conduct by a defendant in actual or apparent authority over a plaintiff, or with power to affect the plaintiff's interest, may give rise to a characterization of the conduct as outrageous, comment e; and (3) conduct may be adjudged outrageous because a defendant acts with knowledge that a plaintiff is peculiarly susceptible to emotional distress, comment f.
The Restatement's repeated insistence that the conduct be extreme and outrageous is no mere happenstance. According to Professor Prosser, the Reporter for the 1965 Restatement Second, the replacement of the "privilege" test[2] of the 1948 Restatement for one of "outrageousness" in 1965 was in response to the perceived need "for a more limited statement which will set some boundaries to the liability" for intentional infliction of distress. Prosser, Insult and Outrage, 44 Calif. L. Rev. 40 (1956). The Court cannot ignore this limitation.
In the judicial realm, careful study of the decisional law of intentional infliction of emotional distress reflects "wide-spread acceptance of the tort in principle and a narrower ... recognition of the tort in practice." Givelber, Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 Colum. L. Rev. 42, 62 (1982). In the vast majority of cases where liability has been found, the common thread has been the existence of three factors. First, a pre-existing legal relationship between the parties has existed, typically a debtor-creditor, insured-insurer, landlord-tenant, physician-patient or employer-employee relationship. Second, the defendant's conduct has involved excessive self-help in asserting a legal right or avoiding a legal obligation flowing out of the relationship, or coercive and oppressive abuse of an employee by the employer. Third, the evidence has clearly shown that the defendant calculatedly inflicted suffering or heedlessly and *170 contemptuously disregarded the plaintiff's present emotional suffering either to force the plaintiff to accede to the defendant's wishes or to punish the plaintiff for prior failure to comply. Id. at 63-64.
A few cases will illustrate these limitations in practice. In Ford v. Hutson, supra, the defendant home buyer subjected the plaintiff realtor to repeated public browbeatings, obscenities and threats over a two year period, even resorting to entering her home without permission and verbally attacking her in front of her guests. The case classically illustrates (1) a pre-existing, legal relationship (buyer-seller); (2) excessive self-help on the part of the buyer in asserting a legal right arising out of the relationship (redress for the sale of an allegedly defective house) rather than resort to the court; and (3) conduct calculated to cause the plaintiff suffering in order to force her to accede to the defendant's demands.
The plaintiff in Fletcher v. Western National Life Insurance Co., 10 Cal. App. (3d) 376, 89 Cal. Rptr. 78, 47 A.L.R. (3d) 286 (1970), sued the defendant insurer upon the insurer's failure to pay benefits under a disability insurance contract. During negotiations, the insurer invented a dispute about the representations made by the plaintiff in applying for the policy and about the source of plaintiff's disability. Again, the evidence reveals a pre-existing insured-insurer relationship, oppressive conduct in attempting to avoid a legal obligation (payment of the claim), and conduct calculated to cause the plaintiff distress in order to force him to settle his claim for less than his due.
An employment case, M.B.M. Co. v. Counce, 268 Ark. 269, 596 S.W. (2d) 681 (1980), is also illustrative of the general limitations of the tort. The plaintiff was "laid off" from her job as cashier the day after a shortage appeared in her cash register. She denied taking the money and was told her lay-off was the result of the defendant's having too much counter help. When the plaintiff asked about her pay, she was told she would have to take a polygraph test before the defendant would release her check. Upon passing the test, the defendant deducted one-third of the missing amount from the plaintiff's wages, giving her a check for $0.81. In order to receive her pay, the plaintiff was forced to initiate a labor department investigation.
*171 The plaintiff was denied unemployment benefits because the defendant stated that she was laid off because of numerous customer complaints, a bad attitude and violation of company rules. The plaintiff had never had any problems with customers.
Although the Arkansas court held that the plaintiff had no cause of action for outrage based on her discharge, it found the defendant's conduct after the termination to create an issue as to whether the defendant had intentionally inflicted emotional distress. The employer's calculated infliction of distress by coercive abuse of his employee for the purpose of recouping his loss meets the Restatement and judicial guidelines.
On the other hand, the widespread reluctance of courts to permit the tort of outrage to become a panacea for wounded feelings rather than reprehensible conduct is representatively illustrated by Swallows v. Western Electric Co., 543 S.W. (2d) 581 (Tenn. 1976). Two supervisory employees of the defendant-employer were mailed envelopes containing an ace of spades which acts they understood as threats. They told the plaintiff-employee that he was their "number one suspect" although the plaintiff denied any knowledge of the mailings. The employees convinced the defendant-employer to hire the defendant Pinkerton's, a security service, to investigate the plaintiff's background in minute and personal detail for about six months. The defendant-employer also attempted to formally discipline the plaintiff without cause but was reproved by a federal mediator.
The court affirmed the dismissal of the pleading because it found that the complaint did not describe "the substance and severity of the conduct" of the defendants so that the court could determine whether the conduct could reasonably be regarded as so extreme and outrageous as to permit recovery. Id. at 583.
While we do not intimate that every case falls neatly within a simple equation, we have discerned certain limitations established by the Restatement and cases interpreting it which we feel compelled to recognize. With these limitations in mind, we now review the evidence in this case to determine whether any of the appellants engaged in conduct which may reasonably be regarded as outrageous.
*172 Although we are required at this point to view the evidence in the light most favorable to Todd, we are not allowed to embellish it by frequent flights into the fanciful. The record reflects that coincidental to Todd's employment problems he was involved, in his own words, in "a nasty" divorce, spawning rumors which "shamed" and "embarrassed" him. He re-married within three months of the divorce, which was granted in April or May, 1979.
Moreover, since coming to the Farm Bureau companies in 1970, Todd's supervisor testified that in 1974, Todd admitted forging an adjuster's signature to a hail loss claim but Bill Lee decided against firing him. Todd testified that he "didn't think" he forged the name but admitted discussing the situation with Lee. Todd did admit to being placed on probation in 1977 because of his low work record.
Likewise, with respect to this incident, the record reveals that the Farm Bureau companies, or some of them, entered into a contract with Equifax which provided that Equifax would perform arson investigations for the companies. Equifax was paid $30,000. We have great difficulty understanding the dissent's persistent characterization of Equifax as an agent.
The investigators Equifax assigned to the case went to Loris and, when in need of an office once or twice a week, used the Farm Bureau office out of which Todd worked. Assuming as we must that an informant was invented, it was Equifax who invented one and then conveyed to the companies the information that Todd was leaking results of the investigation to a torch man.
The administration of the PSE test was done at the behest of and by Equifax. There is no evidence that Equifax or the Farm Bureau companies realized that the use of such a test is prohibited in South Carolina until after the institution of this lawsuit.[3] The test itself consists of answering questions into a *173 tape recorder. Todd testified that he "freely," "voluntarily" and without "compunction" took the PSE test. Equifax had the tape analyzed and told the Farm Bureau companies the analysis indicated deception. At that point, Equifax's conduct ended.
We hold that Equifax's conduct may not reasonably be considered extreme, outrageous and utterably intolerable in a civilized community. At its worst, the evidence shows that Equifax lied and that it asked Todd to take a test whose use was later learned to be violative of the State's Polygraph Examiner's Act. Violation of such a statute does not import turpitude or outrageousness. See State v. Horton, 271 S.C. 413, 248 S.E. (2d) 263 (1978). Nor is lying, in and of itself, outrageous conduct. See, e. g., Jones v. Nissenbaum, Rudolph & Seidner, 244 Pa. Super. 377, 368 A. (2d) 770 (1976); Public Finance Corp. v. Davis, 66 Ill. (2d) 85, 4 Ill. Dec. 652, 360 N.E. (2d) 765 (1976).
The tort of outrage was designed not as a replacement for the existing tort actions. Rather, it was conceived as a remedy for tortious conduct where no remedy previously existed. Here, an action for defamation, which is the usual remedy to be employed against one who has published falsehoods, is available to Todd.
Finally, we hold that the Farm Bureau companies' conduct may not reasonably be regarded as outrageous. At their instance, without the suggestion or involvement of Equifax, the companies asked Todd to submit to a polygraph test based on the report of Equifax whom they had no reason to suspect of untruthfulness. The day before the test Todd asked that it be delayed so that he could have counsel present. His request was denied and his refusal to take the test scheduled resulted in his discharge.
In asking the Court to view the conduct of all parties as the conduct of each party, Todd apparently concedes that neither the conduct of the Farm Bureau companies nor Equifax, standing alone, is outrageous. Generally, the law imposes upon one responsibility for the conduct of another under the doctrine of respondent superior. Prosser, Law of Torts, 458-459 (4th ed. 1971). Since the evidence reveals Equifax to be an independent contractor and not an agent, the Farm Bureau Companies clearly cannot be charged with Equifax's conduct.
*174 While it is well-established that the law charges an actor with liability for every reasonably foreseeable consequence of his tortious act, it requires that the tortious act be established first. See Hutson v. Continental Assurance Co., 269 S.C. 322, 237 S.E. (2d) 375 (1977). Only in an action alleging a conspiracy does the intentional acts of a subsequent actor build upon the intentional acts of the initial actor to create a tortious act. See 16 Am. Jur. (2d) Conspiracy Sections 49-56 (1979). There is no evidence to support an inference that Equifax conspired with the Farm Bureau companies.
Since we have previously stated that Equifax's own conduct may not reasonably be regarded as outrageous, there is no initial tortious act from which consequential liability can be imposed on Equifax based on the Farm Bureau companies' subsequent acts. On the evidence in the record, we hold that Todd failed to present any evidence from which a reasonable inference could be drawn that the appellants intentionally inflictd emotional distress by outrageous conduct.

III.
We do not reach the issue whether Todd's third cause of action, bad faith termination of a contract, is cognizable in this State under an implicit holding of Hudson v. Zenith Engraving Company, Inc., 273 S.C. 766, 259 S.E. (2d) 812 (1979), since the evidence reveals that Todd could not prevail on any theory implicitly recognized in Hudson.
In Hudson, the Supreme Court, while noting that the termination of employment at will does not normally give rise to a cause of action for breach of contract, acknowledged that courts in some jurisdictions have recognized an exception where the discharge violated public policy. Indeed, substantial inroads have been made on the general rule that an employer may terminate the employment of an at-will employee for any reason. Annot., 12 A.L.R. 4th 544 (1982).
In the case sub judice, Todd has articulated no public policy which was violated by his discharge and we discern none. The Farm Bureau companies terminated Todd upon his refusal to take a polygraph test as scheduled. In the absence of a statute barring polygraph tests as a condition *175 for hiring or continuation of employment, we find the appellants' actions in terminating Todd consonant with the public policy of this State. Cf. Perks v. Firestone Tire & Rubber Co., 611 F. (2d) 1963 ( (3d) Cir.1979) (Pennsylvania statute barring polygraph embodies public policy, violation of which gives rise to liability); Larsen v. Motor Supply Co., 117 Ariz. 507, 573 P. (2d) 907 (Ariz. App. 1977) (in the absence of statute, employees' discharge for refusal to consent to take test for deception is not violative of public policy).

IV.
The appellants' sixty-four Exceptions raise numerous additional issues addressing, among other things, the admission of evidence and the instruction of the jury. With one exception, we do not reach these issues since our previously-discussed findings are dispositive of the case and the consideration of further issues is not necessary to our decision on this appeal. S.C. Code Ann. Section 14-8-250 (Supp. 1983).
We have considered the appellants' contention that the trial court erred in admitting over their objection the deposition of Richard Romard, an executive of Equifax, because it contained hearsay evidence. This testimony constituted the only evidence of Equifax's status as an agent of the Farm Bureau companies. It is important because we have previously determined that there is no admissible evidence to support Todd's theory of Equifax's agency. We agree that the testimony should have been excluded.
The court allowed Todd to read into evidence without any limiting instructions this challenged testimony by Romard:
Q. Okay. Now, were you hired by Farm Bureau to do an investigation on Wendell Todd?
A. I understand that  this is my recollection now. That Farm Bureau asked Mr. Parrish to get a voice stress analysis from Mr. Todd.
Q. Were you involved in that conversation?
A. No. Not until the fact. It was a verbal conversation between somebody in South Carolina Farm Bureau and Mr. Parrish or Mr. Pope.
Todd contends that if the statement is hearsay, it is nevertheless admissible as an admission against interest.
*176 The challenged statement is clearly hearsay. Moreover, we hold that the statement does not fall within the exception permitting introduction as an admission against interest. Such an exception is accorded a statement by a party or one identified with a party in legal interest, of the existence of a fact which is relevant to the cause of his adversary or opponent. McCormick, Handbook of the Law of Evidence 502-505 (1954). Moreover, the admission may only be established by one who heard the declaration or admission. R.E. Allen Bro. & Co. v. Burnett, 92 S.C. 95, 76 S.E. 368 (1912).
The evidence reveals that Romard neither heard the admission nor could identify whether an authorized agent of the Farm Bureau companies made the admission. The testimony was prejudicial to the Farm Bureau companies' position. Therefore, we hold that the court erred in failing to sustain appellants' objection and exclude the evidence.

V.
For the reasons herein given, we find that the evidence does not support a reasonable inference that the appellants intentionally interfered with Todd's employment contracts, wrongfully discharged him or engaged in outrageous conduct which inflicted severe emotional distress on him. Therefore, the general verdict must be and is
Reversed.
GOOLSBY, J., concurs.
GARDNER, J., dissents.
GARDNER, Judge, dissenting:
The majority opinion strips the jury of its prerogative to determine issues of fact. I would affirm because I am convinced the general verdict rendered is supportable as to at least one of the causes of action submitted to the jury.
The majority correctly analyzes the impact of the "two-issue rule" on this case. Under that principle, a general verdict must be affirmed when it is supportable on any one of the causes of action submitted to the jury. Anderson v. West, 270 S.C. 184, 241 S.E. (2d) 551 (1978); Gasque v. Heublein, Inc., S.C. 315 S.E. (2d) 556 (S.C. App. 1984).
*177 This case was submitted to the jury on three theories: (1) wrongful interference with contractual relations; (2) outrage; and (3) wrongful termination of employment. Appellants agreed to the general form of verdict submitted to the jury. Under these circumstances, allegiance to the "two-issue rule" requires this court to affirm if any one of the three causes of action was properly submitted to the jury. Thus, if any competent evidence was presented to create a jury issue as to any one of the causes of action, this verdict must be affirmed. In determining whether any competent evidence exists to support the verdict, this court must view the evidence in a light most favorable to plaintiff Todd. See cases collected in West's South Carolina Digest, Appeal and Error, Key No. 927(3).
Plaintiff Todd, during all pertinent times, was a married man with a minor child. He made his living as an insurance agent and had been employed by the appellant insurance companies since 1972, during which time he has accumulated hundreds of customers with yearly renewable policies from which he earned a commission. Plaintiff Todd was so employed when claims manager Garnett hired Equifax to investigate fire losses in Horry County.
Equifax's agent Parrish reported that plaintiff Todd was hindering the investigation by leaking information to a "torch man." Parrish said this information came from an informant whose name he refused to reveal. Agent Parrish then submitted plaintiff Todd to a voice-stress analysis test in the presence of the Loris office manager for Farm Bureau. A voice-stress analysis or PSE test is proscribed by the laws of the State of South Carolina. See South Carolina Code of Laws § 40-53-40 (1976). By affidavit, Equifax's agent Parrish stated he would take the Fifth Amendment regarding his administration of the voice-stress analysis test upon plaintiff Todd.
Subsequently, the results of the illegal test were revealed to Garnett as having indicated stress, and plaintiff Todd was asked to submit to a polygraph test "to clear up the matter." When Todd requested a postponement of the test until his attorneys could be present, he was fired by W.D. Lee, vice-president of sales for Mutual and state sales manager for the Life and Casualty Companies. Plaintiff Todd testified he suffered a great deal of embarrassment and mental distress due to the accusations about him, the imposition of the voice-stress analysis test, and his discharge.
*178 It is undisputed that the three Farm Bureau appellants are separate entities, each represented by its own counsel throughout this trial and on appeal. Three separate employment contracts existed between plaintiff Todd and the Farm Bureau companies.

1. Interference With Contractual Relations
I would hold that sufficient evidence existed that Equifax, acting as agent for two of the Farm Bureau companies, tortiously interfered with plaintiff Todd's employment contracts; this is especially true as to the Life Company's employment contract with Todd since the trial judge found as a matter of fact that Equifax was not employed by it. I cannot agree with the majority's assertion that Equifax's actions in accusing Todd of cooperating with arsonists and administering the illegal voice-stress analysis test did not lead to his dismissal. The evidence does not support this conclusion. Moreover, it is a judicial intrusion into the jury's province. Whether or not Equifax's actions precipitated Todd's firing was a question of fact to be resolved by the jury.
I would hold that sufficient evidence was adduced to prove that Equifax, acting as agent for the Mutual and Casualty Companies, intentionally interfered with all three contracts of employment by trumping up ostensibly groundless charges against Todd and administering an illegal PSE test to him, both of which led directly to his discharge. I believe the trial judge would have been in error had he refused to submit this cause of action to the jury.

2. Outrage
The majority asserts that appellants' conduct toward plaintiff Todd was not extreme and outrageous as a matter of law and that, therefore, this issue was not one for the jury. I disagree. The applicable rule is set forth in an annotation in 86 A.L.R. (3d) at page 457 as follows:
It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and where reasonable men may differ, it is for the jury, subject to the control of the court, to determine *179 whether the conduct has been sufficiently extreme and outrageous to result in liability.
The pivotal issue, then, is whether reasonable men might differ in determining if the tort of outrage had occurred.
Unjustified accusations of infidelity were grounds for legal separation of a marriage in South Carolina prior to the Divorce Act of 1948. As the writer understands, false accusations of wrongdoing result in similar changes in pulse rate, perspiration and blood pressure as does lying when measured by polygraph machines. The writer feels that false and unjustified accusations of infidelity to one's employer made by an investigator of the employer, thus threatening one's means of earning a living, must of necessity result in mental distress and emotional trauma; a fortiori, when the false and unjustified accusations are that the employee is associating and collaborating with felons committing crimes against the employer and the unjustified and false accusations are followed by the humiliating experience of having to submit to an illegal PSE test and especially when all these psychic wounds and insults are exacerbated by a disgraceful discharge. In an instant, one would realize that the dissemination of such accusations and other affronts would forever and one's career. The writer submits that the twelve jurors reasonably concluded that the appellants' conduct was so outrageous as to constitute the tort of outrage. The learned and esteemed trial judge thought so and so does the writer of this dissenting opinion. Numb sensibilities to this type of conduct seem unreasonable to the writer.
I would hold that reasonable minds could differ on this question under the situation which existed, and that viewing the evidence in a light most favorable to Todd, the verdict is not only supportable on this theory but that it would have been error for the trial judge to grant appellants' motion for nonsuit.
In Ford v. Hutson, 276 S.C. 157, 276 S.E. (2d) 776 (1981), the South Carolina Supreme Court formally recognized the tort of outrage. That case involved abusive actions by a physician to the realtor from whom he had purchased an allegedly defective house. The Court upheld a verdict for actual and punitive damages against the physician, despite his contentions that his conduct was neither extreme nor outrageous. The Court *180 stated: "When evidence is in conflict and susceptible of more than one reasonable inference, it is the province of the jury to make a factual determination." 276 S.C. at 166, 276 S.E. (2d) 776.
Similarly, in Hensley v. Heavrin, 277 S.C. 86, 282 S.E. (2d) 854 (1981), a woman brought suit against a physician for an incorrect diagnosis of venereal disease, alleging the intentional infliction of emotional distress or outrage. The Supreme Court, relying on Ford v. Hutson, supra, held that the plaintiff had stated a cause of action against the physician. "The question of whether the action of appellant was of such an extreme and outrageous nature as to constitute the tort of mental distress is a question of fact to be determined by the jury." 277 S.C. at 88, 282 S.E. (2d) 854.
Ford and Hensley reveal the Supreme Court's reluctance to invade the jury's province where any competent evidence of extreme and outrageous conduct is present. The majority, however, concludes as a matter of law that despite the apparently groundless charges lodged against Todd, the administration of an illegal PSE test, and the implicit admission of criminal activity by one of the Equifax's investigators, the appellants' conduct was not extreme and outrageous. I would hold that this record contains ample evidence from which a jury could reasonably conclude that plaintiff Todd was the victim of the tort of outrage.
With reference to the majority opinion's conclusion that there was insufficient evidence of severe emotional distress, I would point out that the trial judge carefully instructed the jury that physical manifestations of emotional distress are unnecessary. The writer is particularly concerned about this phase of the majority opinion. When one receives a psychic trauma, our maker often blesses this person with shock, a phenomenon which shields us temporarily from deep and lasting pain and injury. Few of us are capable of verbalizing the agony felt; indeed, few of us have the ability of introspection, self-analysis and diagnosis of the psychic damages suffered. Plaintiff Todd told of his stress  admittedly, not in dramatic terms. The jury with its accumulated experience, after instruction by the learned trial judge, assessed the psychic injury. I would not presume to substitute my judgment for the jury's under the circumstances nor can I concur *181 in the majority opinion which holds that the evidence does not support severe emotional injury to plaintiff Todd; such a holding is inconsistent with my experiences.

3. Wrongful Termination
The majority, though tacitly recognizing the Supreme Court's signal in Hudson v. Zenith Engraving Company, Inc., 273 S.C. 766, 259 S.E. (2d) 812 (1979), that the public policy exception to the terminable-at-will rule might one day be the law in this state, concludes as a matter of law that no evidence of a public policy violation was present here. In so doing, the majority ignores the fact that the public policy considerations which prompted the General Assembly to enact S.C. Code of Laws, § 40-53-40 (1976), were arguably violated by the appellants in this case.
While I would defer to the Supreme Court for the erosion of the longstanding terminable-at-will rule, I would hold that sufficient evidence of a public policy violation was present here to warrant submission of this issue to the jury, guided by the able trial judge's careful charge. Moreover, even if the Supreme Court should decide against the public policy exception hinted at earlier in Hudson, in view of my resolution concerning the other two causes of action, I would still affirm.
Finally, I cannot agree with the majority's conclusion that the trial judge committed reversible error in allowing the plaintiff to read into evidence portions of the deposition of Richard Romard, an Equifax executive. Romard testified that Farm Bureau asked Equifax's agent Parrish to obtain a voice-stress analysis from Todd. This was contrary to the position of Farm Bureau that Equifax had suggested the giving of the PSE test. Accordingly, I would hold that the statement, admittedly hearsay, was admissible as a declaration against interest, one of the recognized exceptions to the rule against hearsay. Alternatively the evidence was cumulative to other evidence presented on this issue and its admission was harmless error, if any.
The majority opinion oversteps the bounds of appellate inquiry by overruling the jury on factual matters. I would hold that sufficient evidence existed to warrant submission of all three causes of action to the jury and that the verdict for *182 actual and punitive damages should be affirmed under the "two-issue rule."[1]
NOTES
[1] The results of the test were not admitted into evidence.
[2] "One who, without privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it." Restatement of Torts, Section 46 (Supp. 1948).
[3] Section 40-53-40 is part of the Polygraph Examiners Act and provides: "Any instrument used to test or question individuals for the purpose of detecting deception ... shall record visually, permanently and simultaneously: (1) the subject's cardiovascular pattern and (2) respiratory pattern ... The use of any instrument ... which does not meet these minimum instrumentation requirements is hereby prohibited and the operation or use of each equipment shall be subject to penalties ... hereinafter provided.

Section 40-53-250 makes the violation of any provision of the Act a misdemeanor punishable by fine or imprisonment.
[1] The above dissent was written in response to the original majority opinion, some four pages less voluminous.