**In re Calhoun THOMAS, Jr., Debtor.**

**Charles J. Prezioso, Jr., Plaintiff,**

**v.**

**Calhoun Thomas, Jr., Defendant.**

**Civ.A. Nos. 96–74163–W, 9:97–1341–8.**

United States District Court,
D. South Carolina,
Beaufort Division.

March 3, 1999.

Brian L. Boger, Columbia, SC, V. M. Manning Smith, Moss and Kuhn, Beaufort, SC, J. Graham Sturgis, Jr., J. Graham Sturgis, Jr. & Associates, Charleston, SC, for plaintiff.

Andrew Kenneth Epting, Jr., Pratt–Thomas, Pearce, Epting & Walker, Charleston, SC, W. Andrew Gowder, Jr., Pratt–Thomas, Pearce, Epting & Walker, Charleston, SC, for defendant.

## ORDER

BLATT, Senior District Judge.

### INTRODUCTION

On January 4, 1995, this action was commenced by the Plaintiff against the Defendant, both South Carolina residents, in the Beaufort County Court of Common Pleas alleging causes of action for intentional infliction of emotional distress and invasion of privacy by wrongful intrusion.

On June 14, 1996, the Defendant filed a voluntary petition under Chapter 11 of the Bankruptcy Code. In the Bankruptcy proceeding, the Plaintiff filed a proof of claim in the amount of $500,000.00 based on the allegations contained in his state court complaint. The Plaintiff then filed a Motion for Relief from the Automatic Stay in order to continue to prosecute his state court action against the Debtor, which motion Bankruptcy Judge Waites granted.[1] Thereafter, the Defendant removed the action to this Court, and this Court has determined that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). The Defendant died on April 17, 1997;[2] this action is being defended by the Trustee of the Defendant's bankrupt estate.

Although this action was set for a jury trial, the Plaintiff on July 16, 1998, filed a Motion to Withdraw Jury Trial Demand,

---

1. *See In re Thomas,* 211 B.R. 838 (Bkrtcy. D.S.C.1997).

2. The parties stipulate that this is the Defendant's date of death.

to which the Defendant consented; thus, this action was tried by this Court, sitting as Judge and jury, on July 27, 1998, and it was tried solely on the cause of action for intentional infliction of emotional distress.[3] Thereafter, this Court required the parties to submit to mediation, which was unsuccessful, and it required the parties to submit further briefs on the issue of whether punitive damages can be awarded under South Carolina law against a deceased tortfeasor's estate; the parties submitted their briefs on this issue by January 26, 1999.

Pursuant to Federal Rule of Civil Procedure 52(a), this Court hereby issues the following findings of fact and conclusions of law.

### FINDINGS OF FACT [4]

1. Grandee Hardy had an intimate romantic and sexual relationship with Calhoun Thomas, Jr., the Defendant, between February, 1993 and January, 1994.

2. During this relationship Ms. Hardy allowed the Defendant to take photographs of her in sexually explicit poses and in the act of sexual intercourse with him.

3. Ms. Hardy broke off her relationship with the Defendant in February, 1994.

4. In March, 1994, Mr. Prezioso, the Plaintiff, began an intimate romantic and sexual relationship with Ms. Hardy.

5. On September 29, 1994, the Plaintiff received an envelope in the mail at his business office. Enclosed were an unsigned letter dated September 23, 1994, and five photocopied Polaroid sexually explicit photographs of Grandee Hardy.

6. During a search of the Defendant's residence on Hilton Head Island, South Carolina, law enforcement officers were able to recover the photostatic copy of the pictures and original copies of the letter in a briefcase and in file cabinets located in the bedroom of the Defendant's home. The briefcase belonged to the Defendant.

7. The Defendant had left a box containing the actual sexually explicit photographs of Grandee Hardy at a motel on Hilton Head Island, the Red Roof Inn, to be picked up by someone whose name he left at the desk. Before being picked up by anyone, the box was taken into custody by the Beaufort County Sheriff's department. The Defendant had reported the photographs as being stolen.

8. The Defendant mailed the September 29, 1994, envelope and its contents to the Plaintiff's business address. The Defendant was the author of the anonymous letter enclosed in the envelope and prepared the photocopy of sexually explicit pictures of Ms. Hardy also found in the envelope.

9. The Defendant mailed a second anonymous letter in November, 1994, to the Plaintiff's business address. It contained no pictures.

10. The September, 1994, letter was addressed to the Plaintiff, and the contents of that letter, along with the photocopies of Ms. Hardy in sexually explicit positions, clearly indicated that Ms. Hardy had a "sexual relationship" with some man,[5] and the letter indicated a threat to the Plaintiff that the sender would mail copies of the pictures to M.U.S.C. employees, which is where Ms. Hardy was

---

**3.** Prior to trial, the Court granted summary judgment to the Defendant on the invasion of privacy by wrongful intrusion claim.

**4.** Findings of Fact numbers 1–9 were stipulated to by both parties, and have been adopted in substance by this Court.

**5.** The pictures do not reveal the identity of the man involved in sexual acts with Ms. Hardy.

employed, unless the Plaintiff paid money to the sender and Ms. Hardy engaged in sex with the sender.

11. The second, November, 1994, letter was addressed to the Plaintiff, and it demanded $5,000.00 from the Plaintiff, to be delivered to the sender by Ms. Hardy.

12. The Defendant intended to harm, and to destroy, the Plaintiff's intimate relationship with Grandee Hardy, and the Defendant intended to hide the fact that he had sent the two letters and the pictures.

13. The Plaintiff began dating Ms. Hardy in March, 1994, and they became *secretly* engaged in April, 1994, as Ms. Hardy's divorce was not then final; the Plaintiff had quickly developed a close attachment to Ms. Hardy. Ms. Hardy's divorce became final in September, 1994, and, prior to the Plaintiff's receipt of the first letter from the Defendant on September 29, 1994, the Plaintiff and Ms. Hardy announced their engagement and a November 7, 1994, wedding date.

14. When the September, 1994, letter arrived at the Plaintiff's office, it was around noon on Wednesday. The Plaintiff opened it while sitting at a conference table where he was eating lunch with his employees; he saw one of the photographs and was shocked. He stood up, walked about fifteen feet to the bathroom and vomited.

15. Upon receiving the first letter and pictures, the Plaintiff was deeply shocked and greatly concerned as to who else may have received copies of these photographs. He was embarrassed, humiliated, and devastated to see these pictures of his fiancé, Ms. Hardy.

16. The Plaintiff did not see or discuss the September letter with Ms. Hardy until the following Friday afternoon when they met to go on a trip to Greenville, South Carolina. Between Wednesday at noon, until Friday afternoon, the Plaintiff spent that time agonizing over what he should do.

17. Between his receipt of the first and second letters, the Plaintiff and Ms. Hardy had discussions about what had occurred in relation to those pictures, and they decided to turn the matter over to the police. The Plaintiff called the Richland County Solicitor's Office and the United States Attorney's Office to request their assistance with his efforts to keep the sexually explicit pictures of Ms. Hardy from being distributed to his friends and business associates.

18. Upon receiving the second, November, 1994, letter, the Plaintiff again felt sick to his stomach but did not vomit. He was under severe stress not knowing who sent both letters, and he had to restrain himself from taking matters into his own hands, as he strongly suspected that the Defendant had sent both letters.

19. As a result of his receiving the two letters and pictures, the Plaintiff was unable to concentrate and to sleep. He suffered severe stress and nightmares.

20. Dr. Linda Moore, a clinical psychologist, who treated the Plaintiff, diagnosed him with "anxiety disorder, not otherwise specified." She had several sessions with the Plaintiff, and at the time of trial, her bill was approximately $1025.00. She confirmed that the Plaintiff was complaining of heightened irritability, interference with his ability to concentrate effectively, and sleep disturbance. Dr. Moore's first contact with the Plaintiff was late May, 1996.

21. As a result of the Plaintiff receiving the two letters and pictures from the Defendant, his marriage to Ms. Hardy, which had been set for November 7, 1994, was postponed until August 8, 1995, when they were married. By May, 1996, both the Plaintiff and Ms. Hardy had filed for divorce; however, by July, 1996, they had reconciled. Then, at the time of this trial, July 27, 1998, Ms. Hardy had filed for divorce.

22. The Plaintiff owns and is the president of a business called "Palmetto Promotions," which manufactures, wholesales, and retails items with logos on them. The Plaintiff spends 90% of his time meeting with the public and selling his product.

23. At the time of trial, Calhoun Thomas, III, the representative of the Defendant's bankrupt estate, testified that the Defendant's estate included a piece of property on Hilton Head Island that was worth[6] $4,200,-000.00; approximately $3,300,000.00 was required to pay the mortgage and other expenses (administrative claims) related to that property. The estate also had $550,000.00 to $560,000.00 in cash. The estimated value of the estate's other assets included: $16,000.00 in personal property; a $30,000.00 five acre island in Beaufort; a $50,000.00 interest in a building in Beaufort; and $10,000.00 equity in a villa. There were approximately $70,000.00 in unsecured claims against the estate. The estate spent $465,000.00 to settle Ms. Hardy's civil lawsuit against the Defendant, which amount in no way affected the Court's decision in this case. Based on the testimony at trial, this Court finds that the value of the Defendant's estate, less all claims against it, is approximately $1,021,000.00.[7]

24. On February 17, 1999, the Defendant filed a Motion to Supplement the Record with testimony regarding the current financial status of the estate of the Defendant. The Court granted the motion, and a hearing was held on March 1, 1999; Calhoun Thomas, III, was the only witness. The Court has considered Mr. Thomas, III's most recent testimony and feels that it is indefinite, inconclusive, and not helpful in determining the value of the

Defendant's estate; therefore, this Court has concluded that the value of the Defendant's estate as listed in paragraph 23 is the most reasonable approximate value of the estate, which has so many contingencies attached to it.

## CONCLUSIONS OF LAW

■ 1. To establish the tort of intentional infliction of emotional distress, or outrage, the Plaintiff must prove by a preponderance of the evidence that: (1) the Defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the Defendant's conduct was so extreme and outrageous that it exceeded all possible bounds of decency, and was atrocious, and utterly intolerable in a civilized community; (3) the actions of the Defendant caused the Plaintiff's emotional distress; and (4) the emotional distress suffered by the Plaintiff was severe so that no reasonable person could be expected to endure it. *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981); *Bell v. Dixie Furniture Co.*, 285 S.C. 263, 329 S.E.2d 431 (1985).

■ 2. This Court is mindful that the South Carolina appellate courts have declared that this tort of outrage should not become a "panacea for wounded feelings," and that a court should review the conduct to decide whether it can reasonably be regarded as outrageous. *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 283 S.C. 155, 321 S.E.2d 602 (1984), *rev'd on other grounds*, 287 S.C. 190, 336 S.E.2d 472 (1985).

---

6. He testified that the value of the property was difficult to describe because there had been appraisals of it from between $1,800,000.00 or $1,900,000.00 to in excess of $10,000,000.00 or $12,000,000.00. In his estimate for the estate tax return, he had valued the property at $4,200,000.00.

7. This amount assumes that a buyer will purchase the Hilton Head property for $4,200,-000.00, and it utilizes the lower $550,000.00 figure for cash.

3. This Court finds that the Plaintiff has proven each element of intentional infliction of emotional distress by a preponderance of the evidence. The Court reaches this conclusion after considering all of the circumstances of the twisted triangle between the Plaintiff, Ms. Hardy, and the Defendant, realizing that the Plaintiff has not always conducted himself with dignity, and knowing that in part the Plaintiff's emotional distress was caused by the fact that Ms. Hardy had participated in the sexual acts and photo sessions with the Defendant. The Court finds the elements as follows: (1) The Defendant mailed the two aforesaid threatening letters and sexually explicit photographs to the Plaintiff, with the intent to destroy the romantic relationship between the Plaintiff and Ms. Hardy, knowing that he would inflict severe emotional distress on the Plaintiff. (2) The Defendant's conduct—the pictures he chose to mail, the contents of the two letters, and the attempt to hide his involvement with the letters—all directed at a person romantically involved with Ms. Hardy, was so extreme and outrageous that it exceeded all possible bounds of decency and is utterly intolerable in a civilized community. (3) Those actions by the Defendant caused the Plaintiff to suffer emotional distress, and (4) the emotional distress suffered by the Plaintiff, who was engaged to Ms. Hardy, was so severe that no reasonable person could be expected to endure it.

4. While the Plaintiff may, or may not, have had a cause of action against another individual if he or she had revealed to the Plaintiff that Ms. Hardy had engaged in a sexual relationship and had posed for sexually explicit pictures with Mr. Thomas, in this case, it is the Defendant's conduct and his method of revealing the information heretofore described, that are the crux of the Plaintiff's claim.

5. This Court is convinced that the Plaintiff did suffer severe emotional distress caused by the Defendant's conduct in mailing the threatening two anonymous letters and sexually explicit pictures to him. This Court finds that although the Plaintiff and Ms. Hardy were married on August 8, 1995, the Plaintiff continued to suffer emotional distress as a result of the Defendant's actions. For example, a foreseeable stress that the Plaintiff was forced to endure because of the Defendant's conduct was his having to be a witness at a public criminal trial. This was foreseeable because turning the matter over to the police was the only legal avenue available to the Plaintiff to cease the Defendant's conduct. This Court is cognizant that Ms. Hardy's actions, of posing for the pictures and not disclosing this to the Plaintiff, in part caused him emotional distress, but the Defendant's conduct was certainly a proximate contributing, if not the most significant, cause of the Plaintiff's emotional distress. In fact, but for the Defendant's conduct, the Plaintiff may never have discovered the existence of the pictures.

6. I find that $300,000.00 actual damages is an appropriate amount to award to the Plaintiff for his suffering emotional distress, in the form of shame, humiliation, worry, sleeplessness, and stress, which proximately resulted from the Defendant's conduct. This amount includes reimbursement for the Plaintiff's medical counseling bills with Dr. Moore.

7. This Court takes judicial notice that based on the same conduct at issue in this action, the Defendant was tried by a jury in federal court before the undersigned in July, 1996, on two counts of criminal extortion, and he was convicted on both counts. The Defendant filed a motion for new trial, and while

this motion was pending, he died. Thereafter, the United States filed a motion to dismiss the indictment against the Defendant due to his death, which the undersigned granted. The Plaintiff asks this Court to rely on the criminal jury verdict as additional evidence in this case; this Court refuses to do so. In rendering this decision, the Court has completely disregarded the prior criminal case.

8. I find that the Defendant's tortious conduct was intentional, willful and malicious; and, therefore, under South Carolina law, I must award punitive damages. *Sample v. Gulf Refining Co.*, 183 S.C. 399, 191 S.E. 209 (1937); *Davenport v. Woodside Cotton Mills Co.*, 225 S.C. 52, 80 S.E.2d 740, 744 (1954); *Gilbert v. Duke Power Co.*, 255 S.C. 495, 179 S.E.2d 720 (1971). However, even if South Carolina general tort law, which requires an award of punitive damages where a tortfeasor acts willfully and maliciously, does not apply to an intentional infliction of emotional distress claim, I would still award punitive damages in this case. I feel that punitive damages are warranted because of the Defendant's egregious willful manner (anonymous and threatening) of intruding into the Plaintiff's intimate relationship with Ms. Hardy with the intent to destroy it.

9. When determining the amount of punitive damages to award, four factors must be considered, *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991): (1) *Relationship to harm caused:* the penalty should take into account the reprehensibility of the conduct, the harm caused, the defendant's awareness of the conduct's wrongfulness, the duration of the conduct, and any concealment. Here, this Court finds that the Defendant's conduct was utterly reprehensible, the Defendant knew it was wrong and he created, and executed, a scheme to conceal that he mailed the letters and pictures, and the emotional distress caused to the Plaintiff was great. (2) *Other penalties for the conduct:* the penalty should take into account any other criminal or civil penalty that has been or may be imposed. Here, the Defendant may have been subject to a criminal penalty of jail time, but because of his death he escaped the horror of jail life; moreover, the Defendant was released on bond during the criminal proceedings. Thus, there is no other possibility of a criminal penalty facing the Defendant. Although the Defendant did pay $465,000.00 to settle Ms. Hardy's civil lawsuit against him, this Court has not been advised that any of such amount represented a punitive damage award. (3) *Improper profits and plaintiff's costs:* the penalty may focus on depriving the Defendant of profits derived from improper conduct and on awarding the costs to the Plaintiff of prosecuting the claim. Here, no improper profits are involved, but the Plaintiff has incurred the costs of prosecuting this civil action, although this Court is not aware of the amount of these costs. (4) *Limitation based on ability to pay:* any penalty must not effect economic bankruptcy. Here, the Defendant's estate was in bankruptcy[8] but it does appear to have more assets than debt.

10. Based on the foregoing factors, this Court feels it appropriate to award $125,000.00 in punitive damages to the Plaintiff. Because of what this Court feels is a reasonable value to place on the estate as set forth in Findings of Fact paragraph 23, this award should not bankrupt the estate. Further, this amount will deter others from engaging in similar conduct, will vindicate the rights of the Plaintiff, and will serve *incidentally* to compensate the Plaintiff. Additionally, this amount is less than the actual damages; and,

---

**8.** The parties informed the Court that the Bankruptcy case has been closed.

thus, this Court does not believe it is by any means an excessive amount.

11. Because this Court intends to award punitive damages against the Defendant, an issue of law has arisen as to whether, under South Carolina law, an injured person can recover punitive damages against a deceased tortfeasor's estate. The Defendant takes the position that no South Carolina case is on point, and this Court should rule that, when faced with the question, the Supreme Court of South Carolina will follow the majority rule and not allow such an award. *See G.J.D. v. Johnson,* 552 Pa. 169, 713 A.2d 1127 (1998) (summarizing different states' rules of punitive damages recovery against deceased tortfeasors' estates). This Court considered whether to certify the issue to the South Carolina Supreme Court, but it has concluded that, although no decision directly discusses this issue, South Carolina law *does* allow recovery of punitive damages against a deceased tortfeasor's estate, and, therefore, there is no need to certify the issue.[9] This Court believes that the wrongful death and survival statutes, S.C.Code Ann. §§ 15–51–10, 15–51–40, and 15–5–90, when read in conjunction with *Bishop v. Bishop,* 164 S.C. 493, 162 S.E. 756 (1932), and *Petroleum Transit Co. v. Copeland,* 240 F.Supp. 585 (E.D.S.C.1965), send a clear signal that in South Carolina an injured person can recover punitive damages against a deceased tortfeasor's estate. This conclusion is supported by the stated purposes for awarding punitive damages in South Carolina, namely, punishment of the tortfeasor—(not possible here)—, vindication of a private right, or revenge, deterrence of others from similar conduct, and, incidentally, to compensate the injured party further—(in the sense of attorney's fees, for example, but *not* in the sense of actual damages). *Clark v. Cantrell,* 332 S.C. 433, 504 S.E.2d 605 (1998); *Hicks v. Herring,* 246 S.C. 429, 144 S.E.2d 151 (S.C.1965); *Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co.,* 515 F.Supp. 64, 105 (D.C.S.C.1979), aff'd, 644 F.2d 877 (4th Cir.1981).

12. The plain language of S.C.Code Ann. §§ 15–51–10 and 40 permits a wrongfully deceased person's estate to recover exemplary damages against a deceased tortfeasor's estate. This Court believes that if a deceased person's estate can recover punitive damages against a deceased tortfeasor's estate surely where the injured person survives—for example, a quadriplegic—South Carolina law similarly allows him to recover punitive damages against a deceased tortfeasor's estate. In fact, one theory for allowing punitive damages, that of vindication of a private right, or revenge, by an injured person, is more powerful where the injured person actually survives. From a reading of *Bishop v. Bishop,* 164 S.C. 493, 162 S.E. 756 (1932), this Court is convinced that the South Carolina Supreme Court, by its silence, implicitly approved the awards of punitive damages against the deceased tortfeasor's estate. The consolidated trials there were reversed because they should not have been consolidated, and they were remanded for new trials; if the law was such that punitive damages were not allowed against a deceased tortfeasor's estate, surely the Supreme Court would have commented on that because all five plaintiffs were awarded punitive damages against the es-

---

9. This Court is mindful that it should not surmise or suggest the expansion of state law. *Burris Chem., Inc. v. USX Corp.,* 10 F.3d 243 (4th Cir.1993). Here, however, this Court feels that it is applying state law as it exists in South Carolina.

tate of the deceased tortfeasor. Moreover, this Court is convinced that if punitive damages were not allowed against a deceased tortfeasor's estate in South Carolina, Judge Hemphill in *Petroleum Transit Co. v. Copeland,* 240 F.Supp. 585 (E.D.S.C. 1965), would have ruled that the $10,000.00 amount in controversy for federal court jurisdiction, which was the issue involved there, was not satisfied because only $4,394.89 in actual damages was recoverable and no punitive damages were allowed; instead, the Court ruled that under the circumstances of the case the amount of punitive damages that realistically could be sustained, added to the actual damages of $4,394.89, would not exceed $10,000.00.[10] Because of the decisions in the aforementioned cases, this Court concluded that certification of this issue was not needed.

## CONCLUSION

Based on the foregoing, it is

ORDERED that judgment be entered for the Plaintiff, and that the Defendant's estate pay to the Plaintiff Three Hundred Thousand Dollars ($300,000.00) in actual damages, and One Hundred Twenty Five Thousand Dollars ($125,000.00) in punitive damages, plus costs to which Plaintiff is legally entitled.[11]

**IT IS SO ORDERED.**

---

**10.** It is obvious that Judge Hemphill felt that punitive damages were recoverable against the deceased tortfeasor's estate.

**11.** These legal costs shall not include attorney's fees nor interest prior to the date of the filing of this Order.