15911

PARKER v. SOUTHEASTERN HAULERS, INC.

(41 S. E. (2d) 387)

' *Messrs. Frank A. Graham, Jr.,* and *Fred D. Townsend,* of Columbia, for Appellant, cite:

*Messrs. C. T. Graydon* and *J. Bratton Davis,* of Columbia, for Respondent, cite:

February 10, 1947.

MR. ASSOCIATE JUSTICE STUKES delivered the unanimous opinion of the Court.

Respondent recovered a verdict and judgment against appellant in the Court of Common Pleas for Richland County at the October, 1945, term for $250.00 actual damages and

$350.00 punitive damages, upon a complaint in which it was alleged that respondent was employed by appellant as the driver of a truck in its interstate transportation business; that in May, 1943, respondent was sent to Hattiesburg, Mississippi, to bring back a machine, called a "bulldozer", without instructions that it exceeded in width the highway regulations of any state, nor was he instructed to secure a permit therefor in any state except Mississippi; that he complied with his instructions but in Alabama he was arrested by an officer for transporting the cargo of excessive width, and required to pay a fine of $9.00, through no fault of his; that upon return to his employer, the latter (appellant) attempted to require him to stand the loss of the $9.00, which he had paid from the expense money advanced to him, or to leave his employment, which was in effect a forceful discharge; that under the custom and regulations respondent was required to obtain a release from his last employer in order to obtain other employment, and respondent made due and timely demand for such a release, which appellant negligently and willfully refused to furnish, thereby causing respondent to be deprived of work; and that appellant informed respondent that unless he returned to his former work he would not be given a release and would thereby be prevented from obtaining other work, but respondent was further told by appellant that if he would pay the $9.00 he would be given a release, but respondent refused such wrongful demand and was damaged by appellant's arbitrary, etc., conduct. $3,000.00 was demanded.

The answer was a qualified denial and in addition contained affirmative allegations, substantially as follows: That appellant's business is an essential activity under the War Manpower program; that when respondent left his employment, appellant mailed to him and to the United States Employment Service at Columbia a Termination Slip pursuant to the provisions of the Employment Stabilization Plan in effect in this territory, which only was required by Section V, entitled "Separation Practices"; that respondent did not

request of that agency a review of the facts and a determination of whether he was entitled to a "referral"; that by the authority of the Federal First War Powers Act, 1941, and the amendatory Act of October 2, 1942, the President promulgated Executive Order No. 9328 which forbids new employment except as authorized by the regulations of the War Manpower Commission; that the Emergency Price Control Act of 1942 of Congress provides as follows: "No person shall be held liable for damages or penalties in any Federal, State, or Territorial court, on any grounds for or in respect of anything done or omitted to be done in good faith pursuant to any provision of this Act or any regulation, order, price schedule, requirement, or agreement thereunder, or under any price schedule of the Administrator of the Office of Price Administration or of the Administrator of the Office of Price Administration and Civilian Supply, notwithstanding that subsequently such provision, regulation, order, price schedule, requirement, or agreement may be modified, rescinded, or determined to be invalid. In any suit or action wherein a party relies for ground of relief. of defense upon this Act or any regulation, order, price schedule, requirement, or agreement thereunder, the court having jurisdiction of such suit or action shall certify such fact to the Administration. The Administrator may intervene in any such suit or action."

(The foregoing quotation from the answer is set out in full to demonstrate its entire inapplicability to the facts developed, which will be stated. While the controversy centers about a Federal regulation such as is referred to in the quoted statutory provision, liability is not predicated upon any modification, rescission or determination of invalidity of it. Nor is the non-intervention of the Administrator material, as will be seen.)

There were no preliminary motions and the case proceeded to trial by jury. The evidence was in little conflict, that of respondent tending to substantiate the allegations of the complaint which were supported in part by that offered by ap-

pellant. He testified that after the dispute as to his responsibility for the $9.00 fine he was told by appellant's manager that he must pay the amount or lose his job whereupon he asked for a "release" which appellant refused unless the $9.00 be paid by respondent. The latter went back a few days later to get his pay, which he did without deduction of the amount of the fine, and again asked his former employer, who again refused, to furnish him a release. Application was then made by respondent to another employer, Railway Express Agency, which refused to employ him without a release from his former employer, and he went back to appellant and told the manager that he was being kept out of work, demanded a release which appellant again refused. Then respondent consulted his attorney, this several days after termination of his employment, and the attorney wrote a letter to appellant in effect demanding a release as required, quoting, "by the present United States Rules and Regulations". Thereafter respondent again called upon appellant, whose manager and witness was a Mr. Patterson. Respondent's testimony thereabout is here quoted from the record:

"Q. Now, after that letter was written did you go back to see this man Patterson again?

A. Yes, sir.

Q. All right, what did you tell him and what did he say to you?

A. I asked him whether he was going to give me a release, and he said, 'no. You are going to put the law on me, aren't you?' And I said, 'No. But it looks that way and I went to see Mr. Graydon'. And he said, 'I have got a lawyer, too, and we will test it out in court'.

Q. What did he tell you about how long he would hold you out of work?

A. He said ninety days.

Q. Did he say he was going to do that?

A. That must have been his intention. He didn't give me a release.

Q. Did he tell you he had ever sent you any separation papers or to the employment service?

A. No, sir.

Q. How long were you actually out of work?

A. About six weeks.

Q. How many times did you talk to Patterson about this matter of getting the release?

A. Three different times that I know of.

Q. At any of those times did he ever tell you that he had sent any separation thing to the employment service?

A. No, sir.

Q. Did he ever tell you to go to the employment service?

A. No, sir.

Q. Did he ever give you any copy of anything he claimed to have sent there?

A. No, sir.

Q. And you are sure that you went to see him three times?

A. Yes, sir.

Q. How long was it before you could get any work to do on account of this situation?

A. Six weeks before I got a job."

The job referred to as having finally been obtained, after several refusals elsewhere, was with the City of Columbia, for substantially less salary than he formerly earned when in the employ of appellant, and work was obtained with the city because it was not subject to the Federal regulations referred to. After working there for six months he was eligible for other employment under the Federal regulations and he then obtained work with an express company at a salary about half as much again as he earned from the city and in an amount comparable to his former wages.

There was evidence that during the time respondent was out of work he went to the office of the War Manpower Commission and told them about the dispute with the appellant concerning the $9.00 and was informed that the

Commission had nothing to do with the dispute; and he also futilely went to the office of the Wages and Hours Administration, another Federal agency.

Mr. Patterson contended in his evidence that it was respondent's responsibility to pay the controverted fine, this under his company's rules, because he was required by them to consult the respective State authorities regarding the highway regulations. His testimony thereabout is quoted, as follows:

"A. * * * So Parker said he wasn't going to pay the fine. And of course, he knew the regulations, and there wasn't anything else for him to do. I told him those were the rules, and had been ever since the Haulers had been operating, and they are still the rules and regulations. And he said he would quit. And he asked me for a release and I would not give it to him.

Q. Will you state to the Court why you would not give him a release?

A. Because I needed those men in this operation, and we were moving Government equipment, and the Executive Order had stated that if you had an employee on an essential job and you needed him, that he was frozen, you didn't have to give him a release."

He further testified that after receiving the attorney's letter he got his lawyer and, for the first time, consulted the office of the Employment Service, also called in the record the War Manpower Commission, and learned that it was necessary that the employer give the employee a termination notice and he had his bookkeeper prepare two, one of which was mailed to the War Manpower Commission, and the other to respondent (respondent denied that he ever received his copy). However, the Employment Service received the one addressed to it on June 18th, which it immediately returned to the employer with a letter informing the latter that the Termination Slip should not have been sent to that office, but should be given to the employee only.

It recited that the employee quit on June 10th and ...at the employer did not agree to the release of the emp... ...ee. Mr. Patterson admitted in his cross-examination that h... ...ld respondent that his company, the appellant, was goi... to make him, respondent, pay the $9.00. He attempted to ...s- tify his action in not promptly giving the Termination ...ip upon the ground that the respondent asked for a "release" as did the attorney by letter, which he said was not the ...ne thing. The naivete of this distinction is suggestive ... ...he difference between tweedledum and tweedledee. He f... ...er admitted that respondent, when he went back to see him ...ter his failure to obtain work with the express compan... ...r lack of a release or Termination Slip, may have told him the latter fact; and he admitted without equivocation that respondent went back to him three times and respectfully asked for the paper necessary for him to get another job and every time he was refused, and that he, the witness, knew that without it respondent could not get work with any other employer which was subject to the regulations of the War Manpower Commission, and that despite such knowledge he repeatedly refused to release respondent.

The manager of the office of the United States Employment Service, in charge of the administration of the regulations of the War Manpower Commission, was offered as a witness by appellant and he explained in detail the workings of the applicable plan. If the worker was aggrieved and desired to terminate his employment he could request a Termination Slip and in the event of refusal he should apply to the Employment Office for a "release" over the protest of the employer, and until action of the Office he should not leave the employment. The Office could or not, upon its consideration, grant the employee a "referral" which was authority to any other employer under the plan to give the applicant work, from which action either could appeal. He corroborated the evidence of respondent that the latter went to his office about June 10 or 12, about five or six days prior to Mr. Patterson's call with his attorney, and that upon dis-

cussion with respondent he advised him that his case did not fall within the rules of the office, and that he was not entitled to a referral and that the Office had received no notice from the employer, appellant. The witness corroborated the latter by testifying that respondent told him he had quit his job, but implicit in the verdict is a contrary finding upon this factual point. On the other hand, the witness said that the regulations had been violated by appellant by the latter's failure to give prompt notice of the termination of employment and that upon discharge, if he was discharged, the employee was entitled immediately to a Separation Slip, but that if he quit he was not entitled to it at once. The witness thought that he referred respondent, at the end of their interview, to the office of the Wages and Hours Division, a different Federal agency.

It is seen from the foregoing summary of the evidence that there was a dispute of fact as to whether respondent voluntarily left his employment or quit, as the appellant says, or was discharged for his refusal to agree to deduction from his wages of the $9.00 fine; and a subsidiary issue was whether payment of the fine was a condition imposed by the employer for continued employment—a sort of "or else" discharge. The verdict of the jury may fairly be interpreted as a finding favorable to respondent on this issue, but if the contrary were true it would not absolve appellant from wrong for it is clear from all of the evidence that appellant failed of compliance with the regulations (which the jury found willful by their inclusion of punitive damages in the verdict) whether respondent quit his job or was discharged. This will later be elaborated.

As just implied, in the consideration of the allegations of error we must assume that respondent's version of the facts is true for the jury accepted it, found a verdict for him and we are concluded by this factual finding. Moreover, the fair inference from the evidence is that the regulations of the War Manpower Commission and appellant's failure and refusal to comply with them made a vir-

tual "blacklist" of respondent, as that term is understood in employer-employee relations and in the relevant court decisions. Light upon the history and legal effect of this practice is found in the following annotations: 63 L. R. A. 289; 4 L. N. S. 1118; L. R. A. 1916-C, page 222; 1 Ann. Cas. 474; and Ann. Cas. 1917-A, page 644.

The subject is not without precedent in this Court. Reference is had to *Rhodes v. Granby Cotton Mills,* 87 S. C. 18, 68 S. E. 824, which is referred to by the writers of some of the foregoing annotations. In that case a large verdict for actual and punitive damages was sustained in favor of an employee whose evidence was that his name was wrongly included in a list of strikers, which was furnished other employers and thereby plaintiff was denied employment to his damage, and the employer failed to remove his name from the blacklist after knowledge of the facts. The majority of an able court (the sustention of the verdict was unanimous) held that the blacklist was not illegal *per se* and that the alleged "conspiracy" on the part of the employers was a legitimate combination or agreement but that tort lay in the willful or malicious use of the combination with resultant injury to the plaintiff. This accords with the apparent majority rule. 31 Am. Jur. 977 *et seq.*

There is no practical difference in the effect of the proven facts of the case before us and those involved in *Rhodes v. Granby.* Under the admitted regulations it was the duty of the employer-appellant to promptly furnish written evidence of the termination of employment, *in one form or another,* which appellant failed and refused to do; and, inferably from the evidence, the delict was willful and intentional, to keep respondent in its employ or force idleness upon him. It did the latter for considerable time and thereafter caused him to temporarily earn less than before.

The pertinent regulations which have been referred to are found in Sec. V, Separation Practices, of the Employment

Stabilization Plan, established by the War Manpower Commission for this region, as follows:

"a. Every employer in this region engaged in an essential activity shall give to each employee discharged or released by him and to every person who leaves his employ a Termination Slip (Form A, hereto attached). At the time of the issuance of said Form A, the worker should be advised that said Termination Slip shall be taken to the nearest office of the United States Employment Service, or, in the event that there is no office of the United States Employment Service located at the place in which the employer's place of business is situated, the worker should be advised that the Termination Slip shall be presented to the local Employment Service office at the place in which he seeks employment.

"b. It shall be the duty of the employer to act upon requests by his employees for Termination Slips within three days. No worker shall leave his employment pending action on his request for a Termination Slip. In the event that the employer fails within the time specified to grant a Termination Slip, the worker may request the local office of the United States Employment Service to review the facts and make a determination as to whether or not he shall be entitled to a referral. A worker shall remain at his present employment pending review of the basis of his request for referral when requested to do so by the United States Employment Service."

Respondent was uncontradicted in his testimony that he almost immediately reported his difficulty with his employer to the office of the Employment Service (indeed, the manager of the latter corroborated him) and received no advice or counsel (except the worthless suggestion that he consult the Wages & Hours administration) and there was no evidence of any request of him by the latter that he remain in or return to his former or present employment. Furthermore, his testimony of the transaction with his employer was in effect that the latter had already discharged him, and the

factual issue thereabout was determined favorably to him by the verdict of the jury.

Very tardily, on motion for directed verdict in its favor, appellant took for the first time the position that the trial court was without jurisdiction of this controversy which involves a dispute relating to a Federal war agency, but we think that the lower court did not err in the conclusion that it had jurisdiction. There is no contention about the interpretation, applicability or validity of the pertinent regulations. Respondent proved only a violation of them by appellant to his damage. The proposition that plaintiff or defendant might have required that the Federal Administrator be made a party is unimportant, for neither so moved. Moreover, it is difficult to conceive of any effect his participation in the action could have had upon the legal rights of the parties which have been adjudicated. Instances of intervention by the Administrator in cases pending in State courts are found in 153 A. L. R. 1451. It appears that certain Federal courts were given exclusive jurisdiction by Congress to pass upon the *validity* of the regulations promulgated by the Administrator of the Emergency Price Control Act. 158 A. L. R. 1476, 1477. *Yakus v. United States,* 321 U. S. 414, 64 S. Ct. 660, 88 L. Ed. 834, annotated in 150 A. L. R. 1471. But, as has already been pointed out, that is not the nature of the case before us for it does not involve contest of the validity of the applicable regulations.

This decision does not affect the established law of this state, which is the common law, that ordinarily an employee under contract for employment of indefinite duration may quit his job at will and, as a correlative right of the employer, the latter may discharge the employee without cause (and without duty to furnish him any explanation, recommendation or what not.) *Shealy v. Fowler,* 182 S. C. 81, 188 S. E. 499. See also 39 C. J. 71, 90; 31 Am. Jur. 1103; and 35 Id. 469. Not even under the terms of the advanced National Labor Relations Act is an

employer precluded from discharging an employee, except that he must not do so for union activities or on account of agitation for collective bargaining. *Associated Press v. Board,* 301 U. S. 103, 81 L. Ed. 953, 57 S. Ct. 650. But with the war came extraordinary conditions and the Federal regulations brought new burdens to appellant and other employers engaged in essential industries. These conditions are, for the most part, now happily past. For appellant's willfull failure and refusal to meet the burden as it related to respondent, and to the latter's damage, this action lies. It is not for appellant's following the regulations but its violation of them.

The principles and precedents which have been discussed require decision adverse to appellant of all its questions except the alleged impropriety of the award of punitive damages. In that we likewise find no error.

Appellant's argument discloses the misconception that the action is for breach of contract. On the contrary, it plainly sounds in tort and was so tried without objection. There was ample evidence of willfullness to warrant and support the verdict for punitive damages. Detailed review of the law thereabout is unnecessary. See the many decisions of this court which are collected in 11 S. E. D. 774 *et seq.,* Damages, keynumbers 86 *et seq.* The long-experienced trial judge remarked in refusing motion for new trial that "if there ever was an effort to wreak a man's vengeance on somebody else, I think that (this?) was the case." That, of course, was more than necessary to submit the issue of punitive damages to the jury and their moderate verdict was properly left undisturbed.

There was no exception to the court's instructions to the jury relating to punitive damages; in fact, the single exception to the charge was not argued in appellant's brief, except inferentially. It has been overruled in like manner in our discussion of the main questions.

Judgment affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, TAYLOR and OXNER concur.