Charles G. SATTERFIELD and Vicki Satterfield, Plaintiffs,

v.

LOCKHEED MISSILES AND SPACE COMPANY, INC., Defendant and Third-Party Plaintiff,

v.

TRIDENT INDUSTRIAL MEDICINE, P.A., J.S. Moore, M.D., Diane O. Varner and Biomedical Reference Laboratories, Inc., Third-Party Defendants.

Civ. A. No. 2:84–0454–1.

United States District Court, D. South Carolina, Charleston Division.

Sept. 6, 1985.

William J. Clifford, Charleston, S.C., for plaintiff.

Antony M. Merck, David B. McCormack, Charleston, S.C., for defendant and third party plaintiff.

Mark H. Wall, Charleston, S.C., for Trident, Moore & Varner.

Robert H. Hood, Charleston, S.C., for Biomedical Reference Lab.

ORDER AND JUDGMENT

HAWKINS, District Judge.

This is a diversity action for wrongful termination of an employment contract. The defendant and third-party plaintiff, Lockheed Missiles and Space Company, Inc. (hereinafter "Lockheed"), moves for summary judgment against the plaintiffs pursuant to Rule 56(c), Federal Rules of Civil Procedure. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with any affida-

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. For reasons to be stated, this court is of the opinion that Lockheed's motion for summary judgment should be granted.

## A. FACTS AND PROCEDURAL HISTORY

Charles G. Satterfield (hereinafter "Satterfield") was employed by Lockheed as an electronics missile technician in September of 1979. He was required to have an annual physical as part of his employment. On July 28, 1981, Satterfield reported to third-party defendant Trident Industrial Medicine (hereinafter "Trident") for his physical. Beginning in 1981, certain employees of the Lockheed facility in Charleston were required to have a urine drug screen for marijuana as part of their physical. Pursuant to this requirement, a urine specimen was given by Satterfield on July 28, 1981. The specimen was forwarded by Trident to third-party defendant Biomedical Reference Laboratories, Inc. (hereinafter "Biomedical") for analysis. The specimen was analyzed on July 29, 1981, and a computer report was generated on July 30, 1981. The computer report indicated a positive test result. This result was reported to Lockheed by Biomedical. A retest on the urine sample was performed on August 3, 1981. The retest confirmed a positive result. Satterfield was informed by Lockheed of the positive test result and told that he would be terminated from his position. He was terminated in August of 1981.

Satterfield and his wife initiated a lawsuit in this court against Lockheed on March 16, 1984, based upon his termination. They allege that he was wrongfully discharged for being under the influence of a non-prescription drug when Lockheed knew, or should have known, that his urine sample had been mixed up with others in unlabeled bottles. The plaintiffs also assert the enzyme multiplied immunoassy test (hereinafter "EMIT") was not a dependable test and would give false results. Further, the complaint alleges that the EMIT test does not measure the psychopharmacological effects of whether or not an individual is under the influence of marijuana. The plaintiffs seek recovery on four causes of action: (1) wrongful termination, (2) breach of covenant of good faith and fair dealing, (3) intentional infliction of emotional distress, and (4) invasion of privacy.

Lockheed brought a third-party action on April 4, 1984, against Trident, Dr. J.S. Moore (hereinafter "Moore"), Diane D. Varner (hereinafter Varner) and Biomedical, alleging they were negligent in certain particulars including a failure to properly label and account for Satterfield's urine sample, a failure to advise Lockheed or Trident that the EMIT test was unreliable and rendered false results, and a failure to advise Lockheed or Trident that the EMIT test was not appropriate to measure whether an individual is under the influence of marijuana. As to Biomedical only, Lockheed alleges that it failed to properly analyze the urine specimen. Lockheed seeks indemnification from all third-party defendants for any amounts for which it may be found liable to plaintiffs.

On June 1, 1984, Varner, Moore and Trident cross-claimed against Biomedical. They allege that it failed to properly label the urine sample, analyze it, and advise Lockheed that the urine test was inappropriate or unreliable. They seek indemnification for any amounts for which they may be liable to Lockheed.

Since the time of the institution of this suit, the parties have exchanged discovery requests including interrogatories and motions to produce. Additionally, depositions have been taken of the plaintiffs as well as of Moore, Varner, Dr. Benjamin Flora of Biomedical, and representatives of Lockheed.

On November 16, 1984, Lockheed filed a motion for partial summary judgment seeking to dismiss plaintiffs' causes of action for wrongful termination and breach of covenant of good faith and fair dealing.

On December 20, 1984, the plaintiffs filed their memorandum in opposition to Lockheed's motion. Lockheed submitted a reply to the plaintiffs' memorandum on February 5, 1985.

Biomedical filed its own motion for summary judgment against Lockheed on March 15, 1985. Lockheed submitted no response to that motion. Thereafter, on April 19, 1985, Lockheed moved for summary judgment on plaintiffs' remaining causes of action for intentional infliction of emotional distress and invasion of privacy. The plaintiffs opposed this motion in a June 13, 1985, memorandum. On June 17, 1985, this court heard oral arguments on all motions and took Lockheed's motion under advisement. It stayed all other motions because a disposition in Lockheed's favor on plaintiffs' complaint would render all other motions moot. Since the date of that hearing, the court has received several letters from Lockheed inviting its attention to recent precedent from state and federal courts.

## B. LOCKHEED'S MOTION FOR SUMMARY JUDGMENT

### 1. WRONGFUL TERMINATION

In plaintiffs' complaint they allege, *inter alia*, the existence of a "written contract" for permanent employment between Satterfield and Lockheed, that Satterfield was subsequently wrongfully discharged in violation of this contract, and that, as a result of the alleged wrongful discharge, they are entitled to receive damages.

Lockheed denies existence of a written employment contract between it and Satterfield and asserts that Satterfield's employment was for an indefinite period of time, terminable at-will by either party. Lockheed further argues that, even if Satterfield had a written contract with it, which is denied, such contract was for an indefinite duration and was, therefore, terminable at-will by either party.

In South Carolina, a contract for permanent employment of an indefinite duration, which is not supported by any consideration other than the obligation of service to be performed on the one hand and wages to be paid on the other, is terminable at the will of either party. *Ludwick v. This Minute of Carolina, Inc.*, 283 S.C. 149, 321 S.E.2d 618 (S.C.App.1984); *Hudson v. Zenith Engraving Company, Inc.*, 273 S.C. 766, 259 S.E.2d 812 (1979); *Gainey v. Coker's Pedigreed Seed Company*, 227 S.C. 200, 87 S.E.2d 486 (1955); *Orsini v. Trojan Steel Corporation*, 219 S.C. 272, 64 S.E.2d 878 (1951); *Weber v. Perry*, 201 S.C. 8, 21 S.E.2d 193 (1942); *Shealy v. Fowler*, 182 S.C. 81, 188 S.E. 499 (1936). South Carolina follows the general rule that permanent employment means steady employment, a steady job, a position of some permanence, as contrasted by temporary employment or a temporary job. Ordinarily, where there is no additional expression as to duration, a contract for permanent employment implies an indefinite general hiring, terminable at-will. *Orsini v. Trojan Steel Corporation*, 219 S.C. 272, 64 S.E.2d 878 (1951).

In addition, an employment contract terminable at the will of either party may be terminated at any time, for any reason, or for no reason at all. *Ludwick v. This Minute of Carolina*, 283 S.C. 149, 321 S.E.2d 618, (S.C.App.1984); *Todd v. South Carolina Farm Bureau Mutual Insurance Co.*, 276 S.C. 284, 278 S.E.2d 607 (1981); *Ross v. Life Insurance Company of Virginia*, 273 S.C. 764, 259 S.E.2d 814 (1979); *Parker v. Southeastern Haulers*, 210 S.C. 18, 41 S.E.2d 387 (1947). Therefore, the termination of an employment at-will by either party does not normally give rise to a cause of action for breach of contract. *Hudson v. Zenith Engraving Co., Inc.*, 273 S.C. 766, 259 S.E.2d 812 (1979). If Satterfield was an at-will employee, neither he nor his wife has a cause of action against Lockheed for wrongful discharge.

To prove the existence of written contract between the parties, Satterfield apparently relies upon a "Hire Notice." This document is plaintiffs' only evidence in support of their contentions that he had a written contract. However much the plaintiffs wish it were true, the "Hire Notice"

**1362**

simply does not amount to a written contract.

The uncontradicted affidavit of Claude Callan, Lockheed's Human Resource Representative, establishes that the "Hire Notice" was not a written contract. The affidavit reveals that there was no written contract of employment between Charles G. Satterfield and the defendant Lockheed, that Satterfield was hired for an indefinite period of time, and that he could quit or be terminated at any time.

■ The "Hire Notice" itself states only Satterfield's position, salary and starting date and provides a brief explanation of Lockheed's "Conflict of Interest" policy. There is no mention of an employment contract or employment for a specific time period. The evidence is uncontradicted that Satterfield was an at-will employee whose employment could be terminated at any time. Moreover, Satterfield's own deposition testimony confirms this fact:

Q. What was the period of time for which you were hired? How long were you going to work there?

A. Until I retired. Thirty years if I could.

Q. Did Lockheed tell you you were going to work there 30 years, or do you mean that was your personal intention?

A. There was nothing stated that there would be any reason that I wouldn't work there 30 years when I was hired.

Q. Was there anything stated that you would work there 30 years or any period of time?

A. No. But I think that's true with any job.

Q. Were you obligated to stay there any particular period of time?

A. I would say no.

Charles Satterfield Dep. pp. 15–16.

Q. Was there any term to the contract? Did you have a contract for one year at a certain rate?

A. No.

Q. Any renewal of the contract—year after time—

A. No it's—

Q. When they hired you, were you informed that you could be fired for any reason like they didn't like the color of your hair or you were wearing a mustache or anything like that?

A. No.

Q. Were you aware that that's the way it works in South Carolina?

A. I am now. I wasn't then, but I am now.

Q. Did anyone ever tell you anything to the contrary at Lockheed?

A. You mean that—

Q. You had some special status that prevented them from firing you or letting you go or doing anything they wanted to you as an employee as to terms of termination?

A. No.

Q. .... Have you ever seen anyone previously fired by Lockheed prior to you?

A. Sure. [pp. 108–9].

Q. If you wanted to quit Lockheed, what would you have to do?

A. Give them a two-week notice.

Q. Could you have just walked off the job and said, "I quit"?

A. You could have, ... [p. 119].

In their memorandum in opposition to Lockheed's motion, plaintiffs try to overcome the at-will employment relationship by arguing (1) that portions of an Employee Policies and Benefits Manual "expressed specific provisions of employment which created binding obligations on each party to the employment contract," which Lockheed breached, and (2) that a covenant of good faith and fair dealing is implied by law in at-will employment contracts, which covenant Lockheed breached. Neither of plaintiffs' arguments, however, has merit.

■ The affidavit of Callan belies the contention that the Employee Policies and

Benefits Manual created binding contractual obligations between the parties. As set forth in that affidavit, the Employee Policies and Benefits Manual which Satterfield received was given to all hourly employees; Satterfield received this manual subsequent to his employment with Lockheed; provisions of the manual were not discussed with Satterfield prior to his employment with Lockheed; provisions of the manual could be changed unilaterally by Lockheed, and the manual was not designed to establish any binding terms of employment, but was rather designed for informational and instructional purposes only.

Significantly, plaintiffs cite no case law in support of their argument. Their position is clearly not the law in South Carolina and has been squarely rejected by the majority of jurisdictions addressing the issue. *See, e.g., Caster v. Hennessey*, 727 F.2d 1075 (11th Cir.1984) (applying Florida law); *Ferraro v. Koelsch*, 119 Wis.2d 407, 350 N.W.2d 735 (Wis.App.1984); *Richardson v. Charles Cole Memorial Hospital*, 320 Pa. Super. 106, 466 A.2d 1084 (1983); *White v. Chelsea Industries, Inc.*, 425 So.2d 1090 (Ala.1983); *Heideck v. Kent General Hospital, Inc.*, 446 A.2d 1095 (Del.Supr.1982); *Reynolds Manufacturing Co. v. Mendoza*, 644 S.W.2d 536 (Tex.Civ.App.1982); *Sargent v. Illinois Institute of Technology*, 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1979); *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976); *Shaw v. S.S. Kresge Co.*, 167 Ind. App. 1, 328 N.E.2d 775 (1975). *Contra, Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980).

In *Heideck*, the Supreme Court of Delaware disposed of a similar argument in language which is clearly applicable to the present case:

> Plaintiff's assertion that the Superior Court erred in finding that defendant's *Booklet* did not alter the "at will" status of her employment is, likewise, without merit. This issue is one of first impres-

sion in this Court. Other jurisdictions, however, have resolved the question against the employee at will where the booklet has been deemed to be merely a unilateral statement of company policies and where it does not set out a definite term of employment for company employees.... The *Booklet* in question here was issued by defendant after plaintiff began her employment. It was a unilateral expression of the defendant's policies and procedures on a number of topics, issued for the guidance and benefit of employees. The *Booklet* does not grant to any employee a specific term of employment and does not, therefore, alter plaintiff's "at will" employment status. No error was committed by the Superior Court in awarding summary judgment for defendant. (citations omitted)

*Heideck v. Kent General Hospital, Inc.*, 446 A.2d at 1096–97.

Accordingly, this court must reject plaintiffs' argument that the policy manual created binding contractual obligations.

2. THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

■ Plaintiffs' second cause of action is for breach of an implied covenant of good faith and fair dealing in employment contracts. They argue that since a covenant of good faith and fair dealing is implied in commercial contracts in this state, such a covenant should be implied in at-will employment contracts as well. In support of their position, plaintiffs rely on *Tharpe v. G.E. Moore Co.*, 254 S.C. 196, 174 S.E.2d 397 (1970) and *Deering Milliken Research Corp. v. Textured Fibres, Inc.*, 310 F.Supp. 491 (D.S.C.1970). Reliance on these two cases is misplaced, however, since they are both commercial cases and do not involve employment at-will contracts.

It is not surprising that plaintiffs can cite no South Carolina cases which support their contention in an at-will employment context. For the concept of at-will employee/employer relations, with the attendant right to quit or to fire at any time, for any reason or for no reason at all, *see, e.g.,*

*Ludwick v. This Minute of Carolina, Inc.,* 283 S.C. 149, 321 S.E.2d 618 (S.C.App.1984); *Todd v. South Carolina Farm Bureau Mutual Ins. Co.,* 276 S.C. 284, 278 S.E.2d 607 (1981); *Ross v. Life Ins. Co. of Virginia,* 273 S.C. 764, 259 S.E.2d 814 (1979), is antithetical to the concept of an implied covenant of good faith and fair dealing.

Cases from other jurisdictions have recognized this precise point and have refused to extend the covenant of good faith and fair dealing found in the commercial setting to the at-will employment area. *See, e.g., Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260 (D.Kan.1984); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983); *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982). *Contra, Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980).

The rationale for the refusal to extend this covenant to at-will employment contracts was set forth in *Murphy v. American Home Products Corp.* and it is in line with South Carolina jurisprudence in the field of at-will employment contracts:

> Plaintiff's fourth cause of action is for breach of contract. Although he concedes in his complaint that his employment contract was of indefinite duration (inferentially recognizing that, were there no more, under traditional principles his employer might have discharged him at any time), he asserts that in all employment contracts the law implies an obligation on the part of the employer to deal with his employees fairly and in good faith and that a discharge in violation of that implied obligation exposes the employer to liability for breach of contract. Seeking then to apply this proposition to the present case, plaintiff argues in substance that he was required by the terms of his employment to disclose accounting improprieties and that defendant's discharge of him for having done so constituted a failure by the employer to act in good faith and thus a breach of the contract of employment. No New York case upholding any such broad proposition is cited to us by plaintiff (or identified by our dissenting colleague), and we know of none. New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied, and, if implied will be enforced. [citations omitted]. In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship. *Thus, in the case now before us, plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. In the context of such an employment it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination. The parties may by express agreement limit or restrict the employer's right of discharge, but to imply such a limitation from the existence of an unrestricted right would be internally inconsistent.* (emphasis added).

*Murphy v. American Home Products Corp.,* 461 N.Y.S.2d at 237, 448 N.E.2d at 91.

The recent pronouncements of the South Carolina Court of Appeals have upheld the viability of the at-will employment doctrine in this state. *See, Corder v. Champion Road Machinery International Corp.,* 283 S.C. 520, 324 S.E.2d 79 (S.C.App.1984); *Todd v. South Carolina Farm Bureau Mutual Ins. Co.,* 283 S.C. 155, 321 S.E.2d 602 (S.C.App.1984), and *Ludwick v. This Minute of Carolina, Inc.,* 283 S.C. 149, 321 S.E.2d 618 (S.C.App.1984). South Carolina state courts have yet to adopt, therefore, either of the exceptions to the at-will doctrine put forth by plaintiffs in this case. This court, bound as it is by *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817,

82 L.Ed. 1188 (1938), must grant defendant's motion for summary judgment on these two causes of action.

### 3. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ In their complaint, plaintiffs allege that in terminating Satterfield, "defendant, through its agents, intentionally inflicted grievious [sic], emotional harm upon the plaintiffs...." Lockheed denies this allegation and asserts that, based upon ruling case law, it is entitled to summary judgment as to this cause of action.

In *Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981), the South Carolina Supreme Court formally recognized the tort of intentional infliction of emotional distress, or outrage, as set forth in § 46 of the *RESTATEMENT (2d) OF TORTS.* In *Ford,* the court set forth the elements which a plaintiff must prove in order to recover under this tort as follows:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct, RESTATEMENT (SECOND) OF TORTS § 46, Comment i; (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community," RESTATEMENT (SECOND) OF TORTS § 46, Comment d; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it." RESTATEMENT (SECOND) OF TORTS § 46, Comment j.

*Ford v. Hutson,* 276 S.C. at 162, 276 S.E.2d at 778.

In *Todd v. South Carolina Farm Bureau Insurance Company,* 283 S.C. 155, 321 S.E.2d 602 (S.C.App.1984) (*Todd* II), the Court of Appeals elaborated on these requirements, with particular emphasis on the requirement that the conduct be "outrageous:"

We have already established that one of the elements of the tort of outrage or intentional infliction of emotional distress is outrageous conduct. *It is the legal responsibility of the court to determine whether, on the evidence before it, the defendant's conduct may reasonably constitute outrageous conduct ...* Neither the trial Court nor this court is at liberty to substitute its subjective and provincial sensibilities regarding what is reprehensible and socially intolerable conduct for the guidelines which our Supreme Court has established with its adoption of the Restatement formulation of the tort.

The Restatement Second provides at least three guidelines limiting the scope of intentional infliction of emotional distress: (1) the conduct must be "extreme and outrageous," exceeding "all bounds of decency," "atrocious," and "utterly intolerable"; (2) abusive conduct by a defendant in actual or apparent authority over a plaintiff, or with power to affect the plaintiff's interest, may give rise to a characterization of the conduct as outrageous, comment e; and (3) conduct may be adjudged outrageous because a defendant acts with knowledge that a plaintiff is peculiarly susceptible to emotional distress, comment f.

The Restatement's repeated insistence that the conduct be extreme and outrageous is no mere happenstance. According to Professor Prosser, the Reporter for the 1965 Restatement Second, the replacement of the "privilege" test of the 1948 Restatement for one of "outrageousness" in 1965 was in response to the perceived need "for a more limited statement which will set some boundaries to the liability" for intentional infliction of distress. Prosser, *Insult and Outrage,* 44 Calif.L.Rev. 40 (1956). The Court cannot ignore this limitation.

*Todd,* 321 S.E.2d at 609–10. (emphasis added).

In the present case, the plaintiffs' evidence fails to establish any of the four elements of the tort of intentional infliction

of emotional distress, and, in particular, fails to establish that defendant's conduct was "so extreme and outrageous as to exceed all possible bounds of decency." A review of the relevant portions of the various depositions taken in this case establishes both the plaintiffs' failure of proof and this defendant's right to summary judgment as to this cause of action.

In his deposition, plaintiff Satterfield described the manner of his termination as follows:

A. Okay, When I went to work on Wednesday, Mr. McLoughlan again came out and said that Jim Shirley was here and that he wanted to see me in the office. So I had I said, "Okay. I wonder what he wants." So I went in the office; and Jim started out by telling me, you know, what a good employee I was—that it was hard to find people—that he'd always see me out in the parking lot like a half an hour before the shift started, and I couldn't really figure out what he was getting at. And he said, "Charlie, I hate to be the one to have to bring you this kind of news." I said, "What do you mean Jimmy?" He said, "You've been found in violation of company policy." I don't even remember the numbers of whatever it is of coming to work under the influence of non-prescription drugs, "that I've been directed to tell you that you've been hereby terminated. You're to give me your badge and I'm to escort you to ESB, you know, clean out your locker and all that and we're to go." I said, "Jim, you're kidding me." He said, "Charlie, I wish I was; but I'm not." He said—and I said, "There's got to be a mistake." I said, "There's no way." He said, "Charlie, my hands are tied. There's nothing I can do." He said, "It's out of my hands. I've just been told to do this. I have to do

it." So I cleaned out my locker and away to ESB we went....

\* \* \* \* \* \*

Q. Was there any elaboration as to how it was determined that you were in violation of company policy?

A. Well, sure. He told me that the drug screening had come back positive. That's the only way that it could have—If they'd found me in violation, that's the only way that it could have been.

Q. Did you all discuss that drug screen then?

A. No. He didn't know that much about it other than what he'd been told that I'd been found in violation, that the drug screen had come back positive, and he was directed to come and get me....

\* \* \* \* \* \*

Q. You went and cleaned out your locker and went up to ESB?

A. Right.

Q. What happened there?

A. That's where he turned me over to Claude to do all the processing out.

Q. Did you have any conversation with Claude on this subject?

A. I don't know if you could really call it a conversation or not.

Q. Well, tell me what happened?

A. I was so upset that I wasn't in much of a shape to talk to anybody for any time of length on much of anything. But what it boiled down was when they brought the—you know, he explained that I had, you know, I could—I had so much money coming to me for "X" amount of hours and that this was due me and that was due me from the savings plan I had "X" amounts of dollars; and they had it all out on a little sheet. It was already all typed up and everything; and they had the little termination slip that said that, yeah, I had been found in violation of company policy whatever it was, and that I

had been terminated. And he says, "Well Charlie, we can leave it like this, or we can do it a different way." I said, "Well, what do you mean?" He said, "Well, we can change it to read that you terminated." And I said, "Well, what good would that do me?" He said, "Well, if you went to apply for another job and you had to use Lockheed as a previous employer, when they call back here to ask information on you, and we can say—they say, "Well, why did he leave?" And they say, "Well, he terminated." "Well, what kind of a worker was he?" Well, we go back and look at your work record, and that I had a good work record, that I was always on time. There was never no problem I said, gee, you know, to myself that if I'm going to find another job, well that maybe ought to be the way that I go. I said, "Well, Claude, okay. What alternatives do I have?" ... ["]Nobody ever has, but you have that right to fight it." I said, "Well, you don't have to worry about that because you all will be hearing from my lawyer because I didn't do anything wrong; and I'll fight it." [pp. 52–55]

Q. Did you have any contact with anybody else from Lockheed on that day before leaving?

A. No. [p. 58]

With regard to his first contact with Lockheed after termination, Satterfield stated:

A. It was about two weeks later.... So we sent this letter off to Sunnyvale and about two weeks we got a reply from them saying that Lockheed had open-door policy and that if we felt that strongly about, you know, this situation, that it was not the people in Sunnyvale to make the decision but the people at POMFLANT and to go ahead and contact

them and to set up a meeting. [pp. 59–60]

\*     \*     \*     \*     \*     \*

Q. What did you do?

A. So we contacted Claude—or I contacted Claude, and I explained to him that we had sent a letter off to Sunnyvale, and we had got a reply back that they had the open-door policy and that they felt that we should go ahead and try and set up a meeting between me and the people at POMFLANT to hear my side of the story.

\*     \*     \*     \*     \*     \*

Q. What happened after that?

A. Well, we made the appointment for me to go see Mr. Myers and so—

Q. Just for the record, who is he?

A. He is the base manager for Lockheed. So I went and I told Chuck just what I told you.

Q. Chuck Myers?

A. Right. That we felt there had been a mistake, and I told him about the two urine samples and all of that; and he said, "Yeah," that he felt that if what I was saying was true, that it did indeed warrant an investigation and some looking into; and I had taken the urinalysis that Dr. Baggett had done and the drug screening that Pathologist Associates had done to show them, you know, that both of them were negative, and this was done a week or so after what the one that they had said had all of these things wrong with me. [pp. 61–62]

Concerning his "open-door" meeting with Charles Myers of Lockheed, Satterfield testified:

Q. You told him that you understood that Lockheed had an open-door policy, and that's why you were here and talked about these things?

A. Right.

\*     \*     \*     \*     \*     \*

Q. What did Mr. Myers say to you when you had that meeting with him? You've told me what you told him. Now I'm just trying to find out what he said?

A. He told me that after listening to what I had to say, he thought I had a legitimate reason for them to look into the situation that he felt maybe there was a chance that I got a bum deal, you know; and that he felt that it warranted investigation. I said, "That's great, you know, that's all I'd like to get, you know, because I'd like to get it cleared up." So he said, "Let me, you know, give me a little time. I'll get back with you." I said, "Okay." So two weeks went by; and we never heard anything, so I called him. He says, "Well, I'm having a little trouble to get in to talk to the people at Trident Industrial Medicine. You know, one's been out of town and they've been in meetings and they've been this or I've had to do other things." And I said, "Well, did you talk to Dr. Baggett or to Bruce Sheridan?" And he said, "No. I haven't done that yet." And I said, "Well, you know, I really wish you would talk to these people before you talk to the people at Trident Industrial Medicine." Well, he said, "Okay. We'll try and get that done." So he says, "Give me a couple of days," he says, "I'll get back to you." Well, two or three days and we still haven't heard anything from him. So I call him back again. I said, "Mr. Myers, have you talked to any of these people?" He said, "No. I've got a meeting to go to this afternoon to talk to Mr. Moore at Trident." And I said, "Well, have you talked to Dr. Baggett or Bruce yet?" And he said, "No. But I'm going to do that." And I said, you know, "I really wish you would do that before you talk to Trident to get my side of what's happening to verify that I'm not just trying to pull your leg with what I've told you,

you know." And I think he still talked to Trident first before he ever talked to Dr. Baggett and he finally talked to Bruce and it really upset Bruce because he practically called Bruce a liar at what Bruce told him happened the day he went—what Bruce told him wasn't true that he was just trying to cover up for me. And it really upset Bruce because Bruce is a good Christian, and he wouldn't lie. I don't care for anybody—who it was—Bruce won't tell a lie for you; and I wouldn't ask him to do that anyway. But it really upset him. He said, "Charlie, he didn't believe a word I told him." I said, "Well, Bruce, there's nothing we can do. It's all—If they believe it, they believe it. If they won't believe it, fine. If not, we'll just go to court, that's all because I didn't anything wrong; and I'm not going to let them say that I did do anything when I didn't." So about two or three days I hear from Chuck— Well, I finally had to call him back again because he never did really call me—and he said, well, that he did talk to Dr. Moore and that Dr. Moore had told him that he didn't find it unusual that the second urinalysis had been negative. That it was just probably the urinary tract was dirty and that was the reason that they found all that stuff in the urine to begin with and that he had talked to some of the lab people at Lockheed and Sunnyvale.

Q. Who's "he" when you say he had talked to?

A. Mr. Myers had called the lab. I don't know. He didn't say specifically what lab or who that he had talked to some of the lab people in Sunnyvale and that from what he had talked to Dr. Baggett that he didn't see that there was any reason at all for them to reverse their decision. I said, "Well, that's fine. If that's how you feel then we'll go from here," and hung up the phone; and that was it." [pp. 73, 75–78]

Finally, with regard to the alleged "grievous emotional harm" suffered by him as a result of the termination, Satterfield stated:

A. Well, how would you feel if you had just bought a new home. You'd just moved into it. You'd just put about every penny that you were making into putting in a new yard and getting everything the way that you wanted it; and things were just starting to look up, and you went to work and bam they told you that you were fired. And from what you knew, there was really no good reason at all. Just out of the clear blue sky. Everything is running along smooth. You haven't had any trouble at work. One day you go to work and you're making 30 or $40,000 a year. Well, the next day, you're down to zip wad, nothing. What kind of an impact, you know, emotionally would that have on you? I'm a pretty strong guy emotionally, but you could have knocked me over with a feather. I was really shook up about it; and with my wife being a diabetic and in sort of poor health to begin with, it sure didn't help her at all.

Q. How did it affect your health?

A. For a couple of weeks I was pretty shook up, you know, I was pretty down in the dumps about the whole thing. I had an $800-a-month house payment that we were going to have to make and no money to make it. We had other commitments that we were going to have to meet, and no money coming in. What were we going to do? Where were we going to turn?

Q. Did you have any physical symptoms?

A. Not really. I mean not deathly sick or anything like that other than maybe just nerves and a little shook up. I'm pretty strong emotionally, but it was still something that really just devastated you." [pp. 88–89]

This testimony constitutes the only evidence plaintiffs can offer in support of their contention that defendant's conduct in terminating Satterfield somehow amounted to conduct "so extreme and outrageous as to exceed all possible bounds of decency."

Following *Todd II*, it is this court's responsibility to determine whether defendant's conduct in a given instance may "reasonably constitute outrageous conduct." This court is of the opinion that the testimony establishes conclusively that Lockheed did not act outrageously toward the plaintiffs and, in fact, that it acted properly and within the parameters of civilized conduct in terminating Satterfield. Accordingly, Lockheed's motion for summary judgment should be granted as to this cause of action.

### 4. INVASION OF PRIVACY

■ As their fourth cause of action, the plaintiffs allege that Lockheed invaded their privacy. The complaint in *Corder v. Champion Road Machinery International Corp.*, 283 S.C. 520, 324 S.E.2d 79 (S.C. App.1984), also contained allegations of invasion of privacy. The Court of Appeals set forth the elements of that cause of action:

In order to state a cause of action for this tort the plaintiff must allege: (1) the unwarranted appropriation or exploitation of his personality; or (2) the publicizing of his private affairs with which the public has no legitimate concern; or (3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."

*Corder*, 324 S.E.2d at 82.

It is unclear from plaintiffs' complaint which of the three grounds they are relying upon in this case. Clearly, however, an unwarranted appropriation or exploitation of plaintiffs' personalities is not involved. Presumably, therefore, plaintiffs are claiming either the publicizing of private affairs or the wrongful intrusion into their private activities.

In *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (S.C.App.1984), the Court of Ap-

**1370**

peals set forth succinctly the standard of proof required under both these theories:

> Under a cause of action for the "publicizing of one's private affairs with which the *public* has no legitimate concern" (emphasis added), an essential element of recovery is a showing of a *public disclosure* of private facts. *Beard v. Akzona, Inc.*, 517 F.Supp. 128 (E.D.Tenn.1981). The disclosure of private facts must be a public disclosure, and not a private one; there must be, in other words, publicity. *Harrison v. Humble Oil,* 264 F.Supp. 89 (D.S.C.1967). It is publicity, as opposed to publication, that gives rise to a cause of action for invasion of privacy. *Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978); *Todd v. S.C. Farm Bureau,* supra. Communication to a single individual or to a small group of people, absent a breach of contract, trust, or other confidential relationship, will not give rise to liability. *Harrison v. Humble Oil,* supra; *Beard v. Akzona, Inc.,* supra; *Tureen v. Equifax, Inc.,* supra; *Peacock v. Retail Credit Co.,* 302 F.Supp. 418 (N.D.Ga.1969), aff'd, 429 F.2d 31 (5th Cir.1970)....
>
> When a plaintiff bases an action for invasion of privacy on "intrusion" alone, bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom. *Shorter v. Retail Credit Co.,* 251 F.Supp. 329 (D.S.C.1966)."

*Rycroft,* 314 S.E.2d at 43.

The court finds that the evidence in this case will not support a finding under either of these theories of invasion of privacy.

With regard to the "publicizing of one's private affairs" cause of action, the testimony is uniform that defendant did *not* publicize the results of the test in question; nor did it publicize the fact of Satterfield's termination or the reason therefor. In fact, Satterfield's own deposition testimony corroborates this fact. In addition, Lockheed's agent, Charles Myers, was questioned directly concerning who he would have informed about the decision to terminate Satterfield; and he specifically denied providing any information to anyone in the general public.

In short, the only evidence indicating that Satterfield's termination was publicized suggests that Satterfield himself did the "publicizing." The evidence in this case will not support a finding that defendant publicized plaintiffs' private affairs and defendant is entitled to summary judgment on this ground.

It is, therefore,

ORDERED, that summary judgment be, and the same is hereby, entered for the defendant, Lockheed Missiles and Space Company, Inc. It is

ORDERED FURTHER, that plaintiffs and defendant Lockheed shall each bear their own costs. It is

ORDERED FURTHER, that the third-party complaint and all cross-claims be, and the same are hereby, dismissed. It is

ORDERED FURTHER, that each of the parties to the third-party action shall bear their own costs.

AND IT IS SO ORDERED.